UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

TECNIMED SRL,                                               No. 1:10-cv-7277 (PGG)

                                   Plaintiff,

           – against –

KIDZ-MED, INC. and AMERICAN SCIENTIFIC
RESOURCES, INC.,

                                   Defendants.
----------------------------------------------------------------X


**DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**


YESKOO HOGAN & TAMLYN, LLP
909 Third Avenue, 28th Floor
New York, NY 10023
212-983-0900
Attorneys for Defendants
Richard C. Yeskoo
Thomas T. Tamlyn

Table of Contents

INTRODUCTION                                                                                          1

ARGUMENT                                                                                              3

I.      TECNIMED HAS FAILED TO ESTABLISH IRREPARABLE HARM                     3

        A.      Tecnimed Has Failed to Show that it Will Suffer
                Harm Due To Retailer Confusion                                                       4

                1.  Tecnimed Has Submitted No Evidence of Retailer Confusion     4

                2.  Tecnimed Has Failed to Prove the Existence of Current
                    U.S. Sales Which Could Be Affected By Defendant's
                    Allegedly Wrongful Conduct                                                       5

        B.      Tecnimed Has Failed to Show that it Will Suffer Harm
                Due To Internet Consumer Confusion                                                   7

        C.      Tecnimed Has Failed To Show It Will Suffer Loss of Goodwill     9

        D.      The Limited Insolvency Exception Does Not Apply                                     10

II.     THERE IS NO BASIS FOR THE EXTREME REMEDY OF A RECALL                   11

III.    KIDZ-MED OWNS THE INTELLECTUAL PROPERTY AT ISSUE                       16

        1.      The Parties' Relationship                                                           17

        2.      The Parties' Contract                                                               17

        3.      The Wrist Rocket Factors                                                            19

        4.      Determining the Right to Use Generic Words, Phrases
                And Illustrations                                                                   21

        5.      A Preliminary Injunction Cannot Be Used to "Level the Playing Field"    23

CONCLUSION                                                                                           25

<u>INTRODUCTION</u>

At the hearing on October 29, 2010, the Court ruled that Tecnimed's preliminary injunction motion would be decided under the rule set forth by the Second Circuit's <u>Salinger</u> decision, under which the moving party must show the existence of irreparable harm without the assistance of any presumption that such harm exists based on the nature of the case.  Observing that Tecnimed's first two sets of papers had done little to address the element of irreparable harm, the Court allowed plaintiff a new chance to do so.

It is now clear why Tecnimed sought to rely on the presumption of irreparable harm allowed in pre-<u>Salinger</u> Lanham Act cases, because it has utterly failed to make an evidentiary showing of irreparable harm.  It has constructed a speculative and implausible theory of confusion among professional buyers for retailers with no support whatsoever.  Kidz-Med below rebuts this theory with the evidence from Kidz-Med's out-sourced independent marketing team, who observed first hand that retailer buyers suffered no such confusion at all.  Tecnimed seeks to buttress its theory by using evasive and misleading statements to suggest that its ability to place its product directly with U.S. retailers was suddenly thrown off kilter by the introduction of the Kidz-Med product in August 2010, when the record shows that its efforts to sell directly (rather than through its two former distributors) to U.S. retailers had reached terminal failure long before then, due to Tecnimed's pricing policies mandated by European rather than Chinese manufacture.  Tecnimed has no current direct U.S. sales at all.

Tecnimed has constructed an equally speculative theory of potential loss of sales to internet consumers who are allegedly simultaneously exposed to Thermofocus units in the old Kidz-Med packaging and new Kidz-Med Non-Contact units in similar packaging.  Kidz-Med has stopped selling Thermofocus thermometers in the disputed Kidz-Med packaging in the United States and

will stipulate that it will never do so in the future.  Tirotta Supp. Aff. ¶ 1.  The Kidz-Med Thermofocus thermometer has almost completely disappeared from the United States retail and internet markets.  To the best of defendants' knowledge, only one small US retailer is currently selling the product in stores.  Only three internet merchants are still selling the Kidz-Med Thermofocus on the internet, and none of these merchants displays the old Kidz-Med Thermofocus packaging. Tirotta Supp. Aff. ¶¶ 5-7.  Since there is no longer any possibility that the hypothesized confusion among internet consumers could take place, plaintiff's speculative theory provides no basis for a finding that Tecnimed will actually suffer harm under the facts of the case.

Finally, Tecnimed has presented no evidence linking defendants' allegedly improper activities in the first half of 2010 to any possibility of injury in the future.  In fact it does not even claim that it will suffer such an injury.

Tecnimed has attempted to bolster its speculative irreparable harm case by accusing defendants of bad faith since the hearing.  This charge is false.  Defendants immediately offered to change key elements of the new Kidz-Med packaging, Yeskoo Supp. Aff. Ex. 1, but after a long delay Tecnimed refused to compromise and asked for all the relief it had sought in the preliminary injunction.  Yeskoo Supp. Aff. Ex. 7.  Tecnimed additionally asked that Kidz-Med recall the new non-contact thermometers from retailers.  Id., Ex. 1.  This new demand, not included in its original motion papers and completely unsupported by applicable law, destroyed any possibility of settlement.  Defendants demonstrate below that such a recall would impose huge costs and other burdens on Kidz-Med without providing any material benefit to Tecnimed, apart from the satisfaction of imposing financial harm on a competitor.

Finally, plaintiff concedes in its supplemental papers that the ownership of the disputed packaging design and trademarks must be determined using the Wrist Rocket approach.

Analysis of the <u>Wrist Rocket</u> factors shows that defendants own and may continue to use the trademarks, packaging design, photo, and other matters in dispute.

<u>ARGUMENT</u>

I.    <u>TECNIMED HAS FAILED TO ESTABLISH IRREPARABLE HARM</u>

Tecnimed's supplemental brief specifies the following forms of claimed irreparable harm:

(a)    Loss of sales and future sales opportunities due to "confusion among retailers" as to a possible affiliation between the new Kidz-Med thermometer and the Tecnimed Thermofocus;

(b)    Loss of sales due to confusion among internet consumers simultaneously exposed to the old Kidz-Med Thermofocus packaging and the new Kidz-Med packaging;

(c)    Loss of good will due to attribution to Thermofocus of the Kidz-Med product's allegedly inferior accuracy; and

(d)    Inability to collect damages due to defendants' claimed insolvency.

Supp. Br. at 4-6.

As demonstrated below, none of these theories has any support other than plaintiff's speculation, and each is contradicted by evidence in the record.  Accordingly, plaintiff has not satisfied its burden to "show that, on the facts of their case," failure to issue a preliminary injunction "would actually cause" any commercial injury to Tecnimed at all, let alone "irreparable harm."  <u>Salinger v. Colting</u>, 607 F.3d 68, 82 (2d Cir. 2010); <u>People's United Bank v. Peoplesbank</u>, 2010 WL 2521069 at *6-*7, *9 (D. Conn. 2010) (<u>Salinger</u> requires "separate inquiry into injury" for Lanham Act preliminary injunctions).[1]

---

[1]    Tecnimed cannot adduce new theories or facts in its reply papers.  <u>Nebraskaland, Inc. v. Brody</u>, 2010 WL 157496, *2  (S.D.N.Y. 2010); <u>Landau v. New Horizon Partners, Inc.</u>, 2003 WL 22097989, *10 (S.D.N.Y. 2003).  This is particularly true here where Tecnimed has been given a second chance and has now failed to make an evidentiary showing of irreparable harm in three sets of papers.

A.    Tecnimed Has Failed to Show That It Will
      Suffer Harm Due To Retailer Confusion

      1.    Tecnimed Has Submitted No Evidence of Retailer Confusion.  Tecnimed's claim

that it will lose sales because "it is only natural that some retailers and distributors will be

confused about the origin of the new Kidz-Med product and will consider it to be a second

generation Thermofocus," Supp. Br. at 4; Bellifemine Supp. Decl. ¶¶ 10-13, is based solely on

speculation.  So too is the claim that Kidz-Med's existing placements for the new Non-Contact

thermometer were due to such confusion.  Bellifemine Supp. Decl. ¶ 11.  Tecnimed fails to

identify a single confused retailer in the United States, or even a communication suggesting

confusion, and the contention is moreover inconsistent with Tecnimed's unqualified admission

that there is no likelihood of confusion between Tecnimed's current packaging and the new

Kidz-Med non-contact product.  Bellifemine Reply Decl. ¶ 41.[2]

      The claim of confusion among retailer buyers is in this instance inherently incredible in

light of record evidence that retailer buyers are sophisticated professionals who read the trade

press and closely follow developments in the marketplace, including talking to manufacturers

and their distributors.  O'Leary Aff. ¶ 10.  Cf. W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567,

576 (2d Cir. 1993) (retail buyers generally considered sophisticated buyers who are not easily

confused).

      Tecnimed and Kidz-Med exhibited at the same NACDS trade show in June, 2010, and it

is undisputed the Thermofocus looks different and operates substantially differently than the

---

[2]      Tecnimed's sole new support for confusion is based on an untranslated website
apparently used by an unidentified person in Japan to sell a single new Kidz-Med Non-Contact
by misrepresenting it as a Tecnimed product made in Italy.  Bellifemine Supp. Decl. ¶ 21; Tirotta
Supp. Aff. ¶ 24; Yeskoo Supp. Aff. Ex. 8.  This flimsy anecdote is not evidence of confusion in
the United States, nor does it indicate activity in Japan with a substantial effect on United States
commerce.  Cf. Read Totalplan Corp. of America v. Colborne, 14 F.3d 824 (2d Cir. 1994).

Kidz-Med.  It strains credulity that buyers would be confused that a thermometer being distributed at a Kidz-Med booth is related to a Tecnimed thermometer being shown at the same show by a competitor.  Finally, the affidavit of Patrick O'Leary, the independent marketing professional who led the team which sold the new Kidz-Med Non-Contact thermometer to retailers, establishes that the retailer purchasers of the new Kidz-Med product were aware that it was a different product made in China and that the reason for their purchase was the substantially lower price point, not any confusion that this was a Tecnimed or Tecnimed-related product. O'Leary Aff. ¶¶ 9-11; Tirotta Aff. Ex. 2 (press release to trade identifying the new non-contact as a different product designed by Kidz-Med which was being made in China).

Tecnimed has also failed to prove its unsupported assertion that retailers have a one non-contact thermometer policy.  Bellifemine Supp. Decl. ¶¶ 3, 15.  Tecnimed fails to identify a single retailer with this policy or a single instance where it was unable to secure a sale due to a prior sale by Kidz-Med.  Kidz-Med, on the other hand, has provided evidence that major retailers sell multiple brands of non-contact thermometers. Tirotta Supp. Aff. ¶ 11.

   2. <u>Tecnimed Has Failed to Prove the Existence of Current U.S. Sales Which Could Be Affected By Defendant' Allegedly Wrongful Conduct</u>.  Prior to 2008, Tecnimed sold its thermometers to two distributors in the United States:  Kidz-Med and BV Medical ("BV"). Tecnimed terminated Kidz-Med as a distributor on June 6, 2008 and has not sold any thermometers to Kidz-Med since then.  Kidz-Med has alleged that BV terminated its relationship with Tecnimed in 2009 or early 2010, based on communications with industry sources and its observation that BV is liquidating its remaining inventory of Thermofocus thermometers and is no longer listed as a Thermofocus distributor on the Tecnimed website.  Tirotta Aff. ¶ 12. Tecnimed responded evasively by stating "our relationship with BV remains a good one and

ongoing.  Indeed, we just provided to them a new shipment of thermometers only last Friday,"

Bellifemine Reply Decl. ¶ 24, without stating whether the shipment represented a sale.  The

reason for Tecnimed's evasion is now clear, as BV has recently confirmed to Kidz-Med that it

has stopped carrying the Thermofocus and is interested in a possible purchase of the new Kidz-

Med Non-Contact unit, now renamed the "VeraTemp."  Tirrota Supp. Aff. ¶ 9.[3]

       Tecnimed in 2009 began an effort to sell directly to retailers in the United States, and by

early 2010 had the right to deal with any U.S. retailer.[4]  However, it does not appear that

Tecnimed has obtained any customers.  Tecnimed has failed in three sets of papers to identify a

single customer buying Thermofocus thermometers from Tecnimed.  O'Leary does not know of

any sales, and his affirmation supports his reasons for believing that he and his team would know

of such sales if they existed.  O'Leary Aff. ¶¶ 6-7.  Kidz-Med has canvassed all of the major

retailers, drug store chains and the Internet in an attempt to buy a Thermofocus which had been

imported by Tecnimed, as opposed to a close out BV or Kidz-Med model.  It could not find a

single Tecnimed-imported Thermofocus for sale.  Tirotta Aff. ¶ 13.[5]

       Furthermore, Tecnimed has no evidence that links its failure to make U.S. sales to any

purportedly wrongful conduct by Kidz-Med.  Tecnimed offers no explanation why retailers,

---

[3]    The Court may consider hearsay evidence on a preliminary injunction motion.  <u>Mullins v.</u>
<u>City of New York</u>, --- F.3d ---, 2010 WL 4609208 (2d Cir. Nov. 16, 2010).

[4]    Walgreens and Babies R Us were originally off-limits to Tecnimed due to Kidz-Med's
exclusivity rights under the Settlement Agreement.  Bellifemine Ex. 5 ¶ 3.  However, Walgreens
terminated Kidz-Med as a distributor in August, 2009, Tirotta Aff. ¶ 9, and Babies R Us did the
same in April, 2010.  Tirotta Supp. Aff.  ¶ 5.

[5]    Tecnimed has tried to evade this issue with conclusory statements about Thermofocus
thermometers being sold in the United States without specifying whether they are Kidz-Med or
BV close out models as opposed to thermometers sold by Tecnimed to retailers or other
distributors in the United States.  For example, in his reply affidavit Bellifemine evasively said
"The Thermofocus 5-in-1 can readily be found at Costco.com and Walmart.com."  Bellifemine
Reply Aff. fn 10.  If this ambiguous statement is meant to suggest that Walmart and Costco are
buying Thermofocus thermometers directly from Tecnimed, it is false.  Both Walmart.com and
Costco.com are selling BV imported thermometers. Yeskoo Supp. Aff. ¶ 11.

which have been consistently unwilling to purchase the Thermofocus from Tecnimed since 2009, suddenly changed their mind in 2010 after Kidz-Med introduced its Non-Contact model and became willing to purchase the Thermofocus but failed to do so due to confusion.  Tecnimed has failed to offer competent proof that even one retailer was willing to buy the Thermofocus from Tecnimed but failed to do so due to defendants' conduct.[6]  As noted above, Tecnimed's "one brand rule" for stocking non-contact thermometers has no evidentiary support, but even if it did, Kidz-Med has so far only sold its new non-contact thermometer to fewer than 10 retailers, leaving dozens who could purchase from Tecnimed.  Yet Tecnimed has failed to sell to a single one of these retailers.

The O'Leary affirmation makes it clear that buyers have been and are unwilling to purchase the Thermofocus because production of non-contact thermometers has shifted to low cost suppliers in East Asia, and as a result the Thermofocus Italian-made Thermofocus is not price-competitive.  O'Leary Aff. ¶¶ 6, 9.  Tecnimed's failure to sell Thermofocus thermometers in the United States market has everything to do with global economic trends and nothing to do with Kidz-Med.

---

[6]      Bellifemine claims that Walgreens is interested in purchasing the Thermofocus but will not do so until this lawsuit is concluded.  Bellifemine Supp. Decl. ¶ 32.  Bellifemine does not explain why Walgreens refused to purchase the Thermofocus from Tecnimed between August, 2009, the time it cancelled the agreement with Kidz-Med, and September 21, 2010, the time that this lawsuit was filed.  Bellifemine has failed to set forth a single verifiable fact about his alleged recent conversations with Walgreens.

B.     Tecnimed Has Failed to Show that it Will Suffer
       <u>Harm Due To Internet Consumer Confusion</u>.

Tecnimed's second theory of alleged irreparable harm is that that it is "losing direct sales" to internet consumers due to the potential confusion caused by the <u>current</u> <u>simultaneous</u> presence on the market of the Thermofocus packaging formerly used by Kid-Med and the allegedly similar Kidz-Med trade dress.  Supp. Br. at 5.  Tecnimed claims that "[c]onfronted with these two seemingly affiliated products, many buyers are apt to select the less costly model." <u>Id</u>.

This is claim of harm is based on very limited circumstances.[7]  The possibility of financial harm to Tecnimed from this confusion scenario is precluded in the first place by the fact that Tecnimed has already been paid in full for the Thermofocus thermometers which Kidz-Med has been selling over the internet.[8]  Since Tecnimed is not entitled to any additional economic benefit from these internet sales, Tecnimed would not suffer any injury if, as it claims, an internet consumer chose a Kidz-Med unit rather than a Thermofocus unit because she believed the two products were affiliated.

---

[7]     Tecnimed has never claimed confusion involving the packaging of BV Thermofocus units.  Tecnimed has conceded that there is no possibility of confusion between Tecnimed's current packaging and the packaging of the Kidz-Med product.  Bellifemine Reply Decl. ¶ 41. And Tecnimed's supplemental papers present no claim or evidence that it has suffered any harm based on the theory that Kidz-Med's activities in the first half of 2010 (i.e., industry press releases, TV show placements, and web site information) have any impact on consumer behavior now or into the future.  <u>See</u> O'Leary ¶ 13 (sales benefit to non-consumable goods of TV advertising & placement last only one month); O'Leary ¶ 5 (contrasting substantial marketing budgets of leading thermometer brands with Kidz-Med's limited web marketing and communications to retailers).

[8]     Under the Settlement Agreement, Thermofocus units were released from Tecnimed's warehouse and shipped to "retailers" against purchase orders and without pre-payment. Bellifemine Ex. 5 at ¶ 6.  Tecnimed's right to be paid for these units was protected by instructions for the retailers to remit half of the proceeds of such sales to Tecnimed.  Bellifemine Ex. 5 at 1-2.  By contrast, the Settlement Agreement provides that units used by Kidz-Med for "internet sales" were paid for by cash in advance.  Bellifemine Ex. 5 ¶ 6 at 6-7.  Tirotta Supp. Decl. ¶ 25.  Tecnimed's contention that it is entitled to 50% of the proceeds of Kidz-Med's internet sales has no support in the Settlement Agreement or anywhere else.  Tirotta Supp. Aff. ¶ 25.

Of equal importance, as described above, the Thermofocus in Kidz-Med packaging has virtually disappeared from the US market and none of the three internet merchants currently selling it show the packaging.  Tirotta Supp. Aff. ¶¶ 1, 5-7.  Tecnimed's theory of damage from internet sales rests on the assumption that internet consumers will be simultaneously exposed to the old Kidz-Med Thermofocus packaging and the new Kidz-Med packaging.  Supp. Br. at 5.  The window of time in which this kind of confusion could have taken place has closed and will never open again.  Accordingly, Tecnimed cannot show that the claimed similarity between the packages will "actually cause" Tecnimed to suffer any kind of harm at all.

Tecnimed's farrago of unsupported speculation is utterly insufficient under <u>Salinger's</u> requirement that the plaintiff make an evidentiary showing that failure to issue a preliminary injunction will "actually cause irreparable harm."  <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 118 (2d Cir. 2009) (speculation does not establish irreparable harm); <u>see</u> Kidz-Med Opp. Br. at 11. As in <u>People's United Bank</u>, there has been a "crucial lack of proof" that the alleged confusion will "tend[] to cause commercial injury." 2010 WL 2521069 at *9.  This is not a case where damages in either the retailer or consumer markets are difficult to measure.  This is a case where there are no damages to measure.

C.    Tecnimed Has Failed To Show It
      <u>Will Suffer Loss of Goodwill</u>

Tecnimed's argument that it will suffer loss to its goodwill is specious.  First, as already demonstrated, Tecnimed cannot show any possibility going forward that a consumer could compare the two packages so as to attribute the qualities of a Kidz-Med Non-Contact thermometer to a Thermofocus thermometer.  Second, Tecnimed has failed to submit any independent testing or other competent evidence that the Kidz-Med unit is less accurate than the Thermofocus.  Both the Thermofocus and the Kidz-Med Non-Contact have been certified by the

FDA as safe and effective and received 510(k) certification.  Tirotta Supp. Aff. ¶¶ 12-14.  In order to be certified, the device manufacturer must prove to the FDA that the thermometer is accurate to within plus or minus 0.3°C.  Id.  The FDA has found based on testing data that the Kidz-Med Non-Contact is accurate to this standard.  Id.

Finally, in response to Bellifemine's unsupported speculation that the Kidz-Med unit might be prone to user error, Kidz-Med has submitted strong evidence that the Thermofocus is much more prone to inaccuracy caused by user error than the new Kidz-Med unit.  Kidz-Med's warranty records demonstrate that the Thermofocus has a high incidence of improper use and inaccuracy. Tirotta Supp. Aff. ¶¶ 15-22.   Once again, Tecnimed has not provided any evidentiary basis for its claim of damage. "[S]imply invoking the phrase [good will] is insufficient to make the critical finding to support a preliminary injunction."  Doldo Bros. v. Coors Brewing Co., 2008 WL 657252 (N.D.N.Y 2008).

D.     The Limited Insolvency Exception
       Does Not Apply

Tecnimed's argument that it will suffer irreparable harm based on the alleged insolvency of defendants fails for two reasons.  First, Tecnimed has failed to establish that it has or will suffer any damages which it could not collect due to defendants' financial condition.  As already demonstrated, Tecnimed's theories of damages in both the retail and internet markets are speculative constructs with no evidentiary support.  Defendants' financial condition is irrelevant if Tecnimed cannot establish any monetary damages.

Second, defendants are start-up companies which have incurred operating losses as part of the establishment of a new business.  Courts in the Second Circuit do not apply the involvency exception simply because a startup company has shaky finances.  E.g.,  Meringolo v. Power2ship, 2003 WL 21750009, at *3-5 (S.D.N.Y. 2003) (denying preliminary injunction and

declining to apply the imminent insolvency exception even though the defendant company had "generated almost no revenue from its inception [and] has never earned a profit since its formation," and its "independent auditors have qualified the company's financial statements as a 'going concern' "); General Transp. Servs. Inc. v. Kemper Ins. Co., 2003 WL 21703635, at *3-4 (N.D.N.Y. 2003) (denying a preliminary injunction and finding that "although Plaintiff arguably raises questions about [the defendant's] present financial condition, its assertions fall far short of establishing that [the defendant] is in 'imminent' danger of becoming insolvent," even where the defendant's credit rating had been downgraded to "C//" and the defendant had defaulted on $700 million of its notes and laid off 1,000 of its 7,000 employees).

## II.   THERE IS NO BASIS FOR THE EXTREME REMEDY OF A RECALL

At the hearing on October 29, 2010, plaintiff did not ask, and the Court did not grant, permission for Tecnimed to amend its motion to seek recall of Kidz-Med thermometers from retailers, relief not requested anywhere in its previously filed papers.  The Court should reject its current unilateral maneuver out of hand.

If the Court does consider plaintiff's untimely request, it should reject it.  A preliminary injunction recall order is an "'unusual' remedy," Rogers v. HSN Direct Joint Venture, 1999 WL 728651, *3 (S.D.N.Y. 1999) (quoting Perfect Fit Industries, Inc. v. Acme Quilting Co., 646 F.2d 800, 805 (2d Cir. 1981)), one that is only "granted sparingly," NBA Properties v. Untertainment Records LLC, 1999 WL 335147, *11 (S.D.N.Y. 1999).  See Conopco Inc. v. 3DO Co., 1999 WL 1277957, *3 (S.D.N.Y. 1999) ("extreme remedy"); Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., 1995 WL 528001, *12 n.16 (S.D.N.Y. 1995) ("[r]ecall orders have only been granted in a handful of reported unfair competition cases").  Recall orders are generally restricted to cases involving egregious conduct by the defendant, e.g., King v. Allied Vision, Ltd., 877 F.

Supp. 185, 191 (S.D.N.Y. 1995) (threatening recall if defendant failed to cure its contempt of

prior orders), or additional public policy considerations, such as a threat to safety, e.g.,

Playskool, Inc. v. Product Development Group, Inc., 699 F. Supp. 1056, 1063 (E.D.N.Y. 1988)

(potential safety hazard to children).

A court "should carefully consider the likely burden and expense of a recall before it

imposes the remedy." Perfect Fit, 646 F.2d at 807. The Second Circuit has specified two

circumstances in particular in which recall should not be ordered: (i) where recall "may be

unduly onerous," and (ii) where "the probable benefit to the plaintiff from a recall may not

outweigh the burden to the defendant … even if that burden is relatively light." 646 F.2d at 807;

accord City Merchandise, Inc. v. Broadway Gifts Inc., 2009 WL 195941, *3 (S.D.N.Y. 2009);

Primavera Laboratories, Inc. v. Elizabeth Arden Co., 1993 WL 319214, *1 (S.D.N.Y. 1993).

These considerations weigh decisively against the recall sought by plaintiff, because it

would impose huge burdens and risk on Kidz-Med with virtually no corresponding benefit to

Tecnimed. As O'Leary explains, retailers hate recalls due to the high cost of the work involved

and the loss of revenue due to empty shelf space. Retailers pass all of this pain back to the

vendor through a combination of an administrative fee based on the number of stores, a per-item

fee to cover labor and shipping, a lost sales fee to reimburse for the empty shelf space, and a

restock fee to restock the new product.[9] O'Leary Aff. ¶¶ 14-18. In addition, Kidz-Med would

lose all of its sales between the time of withdrawing the units from sale and the time it is able to

have replacement units restocked on the shelves. Tirotta Supp. Aff. ¶¶2 6-27. And finally there

is the significant risk that Kidz-Med would lose at least one account. O'Leary Aff. ¶ 18.

---

[9]    Bellifemine's speculation that a recall would be easy because the goods are in central
warehouses is incorrect; U.S. retailers do not buy goods to store them. O'Leary Aff. ¶ 20.

If the Court orders a recall of existing units sent to retailers, Kidz-Med estimates the costs to be as follows. Of the 12,000 units sold to retailers so far, about 8,000 have been resold to the ultimate consumer. Thus a recall would involve about 4,000 units. The cost of repackaging the units would be about $1.00 per unit. The retailers and distributors that Kidz-Med has sold to have at least 1,000 stores. The estimated costs, per O'Leary's estimate of the amount of chargebacks by retailers, would be as follows:

| | |
|---|---|
| Retailer Administrative fee | 10,000 |
| Retailer Labor/Shipping | 20,000 |
| Retailer Lost Sales Fee | 40,000 |
| Retailer Restock Fee | 20,000 |
| Kidz-Med Repackaging Cost | 4,000 |
| Kidz-Med Transportation | 1,000 |
| Total | $95,000 |

This cost does not take into account Kidz-Med lost sales and the loss of revenue if any customers stop doing business with Kidz-Med. Tirrota Supp. Aff. ¶¶ 26-27.

In addition, any order requiring Kidz-Med to replace its existing packaging with new packaging involves a cost of approximately $35,000 for graphic art design and printing new inserts.[10] Tirrota Supp. Aff. ¶ 26.

The out of pocket cost alone is a huge consideration for a start-up company such as Kidz-Med. In Hukafit Sportswear, Inc. v. Banff, Ltd., Inc., 1985 WL 5943, *3, *7, (S.D.N.Y. 1985), the court applied the Perfect Fit standard and ordered a recall only after satisfying itself that the defendants were not in a "precarious financial state," and indeed had "convincingly proved their

---

[10]     Defendants would be entitled to a bond to cover all these costs. Hukafit Sportswear, 1985 WL 5943, *8 (increasing amount of bond in light of expenses of recall).

wealth."[11]   The requirement that the Court weigh the burden and avoid imposing crippling injury

is mandatory.   Ideal Industries, Inc. v. Gardner Bender, Inc., 612 F.2d 1018, 1026 (7th Cir.

1979) (defendant permitted to make "normal sales from its inventory" to protect cash flow and

prevent financial disaster, where  "a recall from distributors would irreparably damage

[defendant's] relations with its dealers"); see Nikon, Inc. v. Ikon Corp., 1992 WL 398440, *1

(S.D.N.Y. 1992) (concluding that defendant had had considerable time subsequent to finding of

liability to sell off its inventory, and that it also had overseas markets not restricted by the court's

order), aff'd, 987 F.2d 91 (2nd Cir. 1993).

Second, there is no evidence of benefit to Tecnimed commensurate with the burden on

Kidz-Med.  City Merchandise, Inc. v. Broadway Gifts Inc., 2009 WL 195941, *3 (S.D.N.Y.

2009); Primavera Laboratories, Inc. v. Elizabeth Arden Co., 1993 WL 319214, *1

(S.D.N.Y.1993).  None of the retailers carrying the Kidz-Med thermometer is also carrying the

Thermofocus thermometer, so a recall does not eliminate any confusion at the store level.

Moreover, a recall would not make a significant difference in the time it takes to replace the

packaging at issue at the retail stores.   O'Leary estimated that it would take between 2 to 4

weeks for the retailer to remove the product from the shelves and another 4 weeks to stock a

replacement at shelf level once it becomes effective, which is the same amount of time

packaging would be expected to disappear in the normal course of business after Kidz-Med

stopped shipping it.  O'Leary Aff. ¶ 20.

---

[11]      The court in Hukafit contrasted the case with Jack Lenor Larsen, Inc. v. Dakotah, Inc.,
452 F. Supp. 99, 99 (S.D.N.Y. 1978) in which the court had denied a recall specifically due to
the defendant's "precarious financial state."  In Gund, Inc. v. Golden Bear Co., Ltd. 1992 WL
392602 (S.D.N.Y. 1992), relied on by plaintiff, the court also cited Jack Lenor Larsen, and assured
itself that defendant was not in a precarious financial state before ordering a recall.

Tecnimed, which has failed to prove any irreparable harm, has also failed to prove that depriving Kidz-Med of a short sell off period will cause it any significant harm at all. The only benefit to Tecnimed in ordering a recall is to allow it to inflict financial harm on defendants, an impermissible use of a preliminary injunction.

Finally, Tecnimed's argument that defendants assumed the risk of a recall by ignoring Tecnimed's cease and desist letters is meritless.  First, defendants did not rush the new Non-Contact thermometer to market.  Its December, 2009 press release indicated that it would offer the thermometer the third quarter of 2010 and it entered the market in late August, 2010, on the latter part of the third quarter.  Second, Tecnimed's cease and desist letter dated August 18, 2010 (Bellifemine Ex. 32) maintained that there was a surviving non-competition obligation, a contention this Court has already indicated is baseless, in addition to Tecnimed's theory that it owned Kidz-Med's packaging design.  Defendants thought both allegations were baseless.

Defendants submit that if the Court does issue a preliminary injunction requiring Kidz-Med to change its packaging, it should decline to order a recall and allow Kidz-Med to continue to sell in its existing packaging for one month.  This will allow Kidz-Med to change its packaging in an orderly manner without defaulting on any obligations to ship product.[12]

---

[12]     Retailers typically carry little inventory and expect their vendors to ship orders within days of the order.  They also typically reorder at least once a month.  Kidz-Med will therefore risk substantially harming its relationships with retailers if it cannot fill orders on time. O'Leary Aff. ¶ 21. To preserve its retail relationships, if the Court orders a change of packaging, Kidz-Med needs time to secure new packaging and repackage its goods so that it can fulfill existing obligations.

III.     <u>KIDZ-MED OWNS THE INTELLECTUAL PROPERTY AT ISSUE</u>

At the October 29, 2010 hearing, the Court granted defendants a second chance to persuade the Court that they own the intellectual property rights in their trademarks NeverWake and NeverTouch and trade dress.  The question to be resolved is whether certain discrete elements found in the existing Kidz-Med packaging may be used by Kidz-Med going forward. Defendants submit that the issue must be analyzed in five steps.

First, Tecnimed did not automatically acquire ownership of the matters in dispute by virtue of the parties' relationship.  Defendants were not an agent or fiduciary working on plaintiff's behalf.  Defendants were an independent distributor – one of two in the United States – and had an arms-length relationship.

Second, the starting place for any analysis is the parties' contract.  Tecnimed agrees with this proposition.  We will show that the contract does not give ownership of any of the disputed items to Tecnimed.

Third, if the contract is not dispositive, ownership of trademarks and trade dress is determined by analysis of <u>Wrist Rocket</u> factors.  Tecnimed also concedes this proposition.  It has accepted the <u>Wrist Rocket</u> approach in both its reply papers and its supplemental brief.

Fourth, some of the property at issue is not trademark or trade dress.  They are generic or descriptive terms such as "thermometer", "non-contact" and "5-in-1".  The Court does not need to conduct a <u>Wrist Rocket</u> analysis to determine who can use these words or phrases.  These are generic or descriptive terms which may be freely used by anybody.

16

Fifth, even if the Court determines that defendants engaged in passing off during the first half of 2010, the proper remedy is not to preliminarily enjoin defendants from using property which they would own in the absence of such conduct.

1.    The Parties' Relationship.  At the hearing the Court suggested that when Kidz-Med created the old Thermofocus packaging "you were working for them at the time.  You weren't working for yourself."  Oct. 29 Tr. at 21-22.  Kidz-Med respectfully suggests that this statement reflects a misunderstanding of the relationship.  It would have been true if the work had been done by Tecnimed's employees, for employees are agents of their employer, and thus it is correct to say that they work for their employer rather than themselves.

The parties could have created an agency relationship in their agreement, but instead they expressly provided that the Distribution Agreement "does not make either party the employee, agent or legal representative of the other for any purpose whatsoever".  Bellifemine Ex. 1 at ¶ 16. Kidz-Med instead acted as a distributor, and it is black letter law that a distributor may affix its trademark to a manufacturer's goods and retain ownership of its trademark.  McCarthy on Trademarks, 4th Edition, § 16:48; Omega Nutrition U.S.A. Inc. v. Spectrum Marketing, Inc. 756 F. Supp. 435, 438 (N.D.Cal. 1991) ("The distributor's use of a trademark automatically inures to the manufacturer of the product only when the manufacturer is the original owner of the mark…").

2.    The Parties' Contract.  The parties agree that the starting place for resolving the dispute is to see whether ownership was allocated in the parties' contract.  The Distribution Agreement did not do so. Section 8.1 of the Distribution Agreement provides that Kidz-Med will not use "Tecnimed's trademarks, trade names or any other symbols" except in connection with the sale of the thermometers.  Bellifemine Ex. 1.  Section 8.2 provides that Kidz-Med will not

register "any domain, trademarks, trade names or symbols of Tecnimed or of the Products (nor any domain, trademarks, trade names or symbols that may be confused with Tecnimed's)".  The "Products" are defined in Section 1 as the Thermofocus models 0700 and 1500.  Section 8.5 provides that "the trade name of the product shall be Thermofocus."

      None of these provisions give Tecnimed the right to the Kidz-Med packaging design and words and phrases that Tecnimed now seeks to enjoin Kidz-Med from using.  There is only one trademark for the models 0700 and 1500 registered by Tecnimed in the United States: "Thermofocus."  Defendants are not using this trademark.  The Distribution Agreement defines what it means by "trade name" by providing that "the trade name of the product shall be Thermofocus."  § 8.5.  "Thermofocus" is the only trade name protected by the Distribution Agreement.  Defendants are not using this trade name.  Finally, there are two symbols on the Tecnimed 1500 denoting a forehead and a house.  Bellifemine Ex. 2.  Defendants are not using these symbols.

      Many distribution agreements expressly provide for assignment to the manufacturer of any packaging, trade dress, or trade names later created or used by the distributor.  The parties' agreement does not do so.  Section 8.2, which states that Kidz-Med will not register the trade mark, trade name or symbols "of the Product," protects Tecnimed's existing intellectual property as defined in the Distribution Agreement; it does not expand the scope of Tecnimed's intellectual property protection.  The Products are defined as the model 0700 and 1500 thermometers.  The trademark of the Product is Thermofocus, the trade name of the Product is Thermofocus, and the symbols of the Product are those which appear on the device.  Kidz-Med is not using any of these trademarks, tradenames or symbols for the Kidz-Med Non-Contact thermometer.  Moreover, the Distribution Agreement does not address trade dress or the words and phrases

18

used to describe the operation of the thermometer at all.  Accordingly, ownership of the intellectual property created by Kidz-Med must be resolved by the general trademark principles embodied in the Wrist Rocket approach.

3.      The Wrist Rocket Factors.  The Wrist Rocket approach to resolving distributor-manufacturing disputes has been adopted by courts within the Second Circuit, although they cite to the leading Ninth Circuit case adopting Wrist Rocket, Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1220 (9th Cir.1996), rather than the Wrist Rocket series of cases relied upon in Sengoku. Harrison-Hoge Industries, Inc. v. Panther Martin srl, 2008 WL 905892 (E.D.N.Y. 2008); Tacita Int'l, Inc. v. Atlantic Horizon Int'l, 154 F.Supp.2d 586, 600 (S.D.N.Y.2001).  See also Chestek, Who Owns the Mark? A Single Framework for Resolving Trademark Ownership Disputes, 96 TMR 681, 723 (2006) ("The well defined *Wrist-Rocket* framework" provides "a predictable doctrinal analysis to be used in resolving ownership disputes").  Tecnimed in effect concedes that Wrist Rocket should be used by citing Tactica as its sole authority in its supplemental papers (Supp. Brief at 9) and failing to propose an alternate approach.

Analysis of the Wrist Rocket factors shows that Kidz-Med owns the trademarks "Never-Wake," "NeverTouch," and the package design it used for the Kidz-Med Thermofocus package.

(i)      Which party invented or created the trade dress.  Kidz-Med created the trademarks "NeverWake" and "NeverTouch".  Kidz-Med created the blue and purple color scheme.  Kidz-Med decided to use a picture of a mother and a child on the packaging, something Tecnimed has never done.[13]  There is hardly anything distinctive about a mother and a child

---

[13]      Tecnimed  claims it used the same picture in its trade dress but it is using the word in a different meaning.  Tecnimed apparently used the picture on a banner exhibited at several European trade shows.  Bellifemine Reply. ¶ 31 n.8 & Ex. 7.  But Tecnimed did not use the picture on its packaging, and its recommended packaging was completely different.  Compare Bellifemine Exh 3 (sell sheet with awake baby and no mother) with Tirotta Exh. 3 (Tecnimed

because virtually every thermometer uses the same concept.  Tirotta Supp. Aff. ¶ 3 and Tirotta

Supp. Ex.1.

(ii)      <u>Which party first affixed the mark to goods sold</u>.  Kidz-Med affixed the

NeverWake and NeverTouch marks, the blue and purple color scheme, and the picture of a

mother and child on the goods sold.

(iii)      <u>Which party's name appeared on packaging and promotional materials in

conjunction with the mark</u>.  Kidz-Med's name appears on the front of the package, the rear of the

package and the front of the device itself, which is displayed in the package.  Bellifemine Ex. 5.

Tecnimed's name does not appear on the package at all.  <u>Id</u>. Tecnimed's name is displayed on

the instruction sheet which comes with the product, where it appears beside Kidz-Med's name.

Thus, a consumer examining the packaging will see Kidz-Med's name in three places and not see

Tecnimed's name at all.

(iv)      <u>Which party exercised control over the nature and quality of goods on  which the

mark appeared</u>.  Tecnimed manufactured the goods.

(v)      <u>To which party did customers look as standing behind the goods, e.g., which party

received complaints for defects and made appropriate replacement or refund</u>.  Kidz-Med handled

all claims with respect to the goods.   Only its address, phone number, and web site address

appeared on the packaging.   Tecnimed's argument that it shared this responsibility because its

address is on the instruction sheet is specious.  Tecnimed has not supplied evidence that it

---

packaging with mother and sleeping child). While Kidz-Med did obtain the original mother and
child artwork from Tecnimed, it was Kidz-Med which originated the use of the artwork for
packaging in the United States.  Kidz-Med is now using completely different artwork:  different
models, different hair color, different orientation, and a completely different thermometer design
in the image.

handled a single return.  By contrast Kidz-Med took back and replaced over 1,600 units.  Tirotta Supp. Aff. 23.

(vi)    <u>Which party paid for advertising and promotion of the trademarked product</u>. Kidz-Med did.

Since five of the six <u>Wrist-Rocket</u> factors support Kidz-Med, Kidz-Med is entitled to use the trademarks NeverWake, NeverTouch, the blue and purple color scheme and its new photograph of a mother taking the temperature of a sleeping child.  Indeed, as to the photograph, Kidz-Med has established that the use of such photographs is generic for non-contact thermometers.  Tirotta Supp. Aff. ¶ 3.  It would be unjust to prohibit Kidz-Med from doing the same.

4.    <u>Determining the Right to Use Generic Words, Phrases, and Illustrations</u>.  The right to use the words in "5-in-1 non contact thermometer", "no need to touch, startle, upset or wake your child", "5-in-1 measures any temperature" and "child, food, formula, bath and nursery" is resolved based on whether these words and phrases are generic, descriptive or arbitrary.  It does not matter who originally used the words, as Tecnimed argues.  The first person who manufactures a particular device cannot monopolize all the words he or she has used to describe the operation of that device.  The analysis is straightforward.  If a word or phrase is generic, anyone can use it.  If a word or phrase is descriptive, anyone can use it unless the descriptive word or phrase has acquired secondary meaning.  <u>Playtex Products, Inc. v. Georgia-Pacific Corp.</u>, 390 F.3d 158, 163 (2d Cir. 2004).  A party can only automatically prevent someone from using a word or phrase it originated if the word or phrase is fanciful or arbitrary. Since Tecnimed has failed to allege or prove secondary meaning, it can only stop Kidz-Med from using the terms if they are arbitrary or fanciful.

Tecnimed has not argued that the words and phrases "non contact", "thermometer", no need to touch, startle, upset or wake your child, measures any temperature, and child, food, formula, bath and nursery are anything other than generic or descriptive.  It has effectively conceded that Kidz-Med may use them.  It does not matter that Tecnimed first used these or similar words or phrases.  It cannot lawfully monopolize descriptions of how a non-contact thermometer works or what it can be used for.

Tecnimed argues that the phrase "5-in-1" is arbitrary or fanciful rather than descriptive. A mark is merely descriptive under Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1), if it describes an ingredient, quality, characteristic, function, feature, purpose or use of the relevant goods and/or services. In re Gyulay, 820 F.2d 1216 (Fed. Cir. 1987).  The US Patent and Trademark Office has recently clarified that it will routinely reject trademark applications which claim the exclusive right to use the "x-in-1" formulation without disclaimer on the grounds that the proposed mark merely describes that the product combines more than one function in a single unit. "Where, as in this case, the combination of the descriptive words creates no incongruity, and no imagination is required to understand the nature of the goods, the mark is merely descriptive." Trademark Application No. 77553616 - FIVE IN ONE, Final Office Action (Jan.12, 2009) (rejecting "FIVE-IN-ONE" as "merely descriptive since patrons would immediately [understand] a feature or characteristic of the applicant's goods, namely, a handbag system that can be converted into five different looking handbags").  See also Trademark Application No. 78916533,  ALL IN ONE, Office Action, Nov. 16, 2006 (rejecting "ALL IN ONE" as merely descriptive).

Similarly, the term "5-in-1" describes five useful functions of a non-contact thermometer. 5 in 1 is descriptive, and cannot be protected without a showing of secondary meaning, which Tecnimed has not attempted to make.

As to the five small illustrations of a baby, bath, formula bottle, food and room which Kidz-Med used to create similar illustrations for the Kidz-Med Non-Contact package, Tecnimed does not claim that it holds a copyright or that it can control their use due to a secondary meaning which could lead to confusion.  Tecnimed Reply Br. at 7; compare Kidz-Med Opp. Br. at 22.   Instead Tecnimed claims the right to restrict their use by characterizing the illustrations as "symbols" as defined in the Distribution Agreement.  Websters defines a symbol as "something used for or regarded as representing something else; a material object representing something, often something immaterial; emblem, token, or sign."  The five small illustrations are not symbols, and Kidz-Med's copying was lawful.

> 5.    A Preliminary Injunction Cannot Be Used to "Level the Playing Field"

Assuming that the Court accepts defendants' argument so far – that Kidz-Med owns the trademarks NeverWake, NeverTouch and the packaging design it developed for its Thermofocus sales and may use the other words and phrases and illustrations at issue under standard intellectual property law, the remaining issue is whether the Court may still preliminarily enjoin defendants from using the trademarks, packaging design, words and phrases and illustrations as a remedy for the passing off or blurring that the Court has indicated it will find occurred in the first half of 2010.  The answer is no.

The purpose of a preliminary injunction is to maintain the status quo during the pendency of an action.  Malletier v. Dooney & Burke, Inc., 454 F.3d 108, 114 (2d Cir. 2006).  It cannot be used to effect the ultimate relief that a party may be entitled to.  WarnerVision Entertainment Inc. v. Empire of Carolina, Inc., 101 F.3d 259, 261 (2d Cir. 1996).  If the Court finds that defendants have engaged in passing off its thermometers as a replacement to the Thermofocus it can order defendants to stop doing so.  Defendants have already stopped the challenged behavior

and Tecnimed's papers do not allege that anything has continued past August, 2010 other than defendants continued use of their new packaging, which defendants maintain in good faith they have every legal right to do.[14]

Second, to secure an injunction in a passing off case, the plaintiff must prove that there is a future likelihood of confusion.  Business Trends Analysis, Inc. v. Freedonia Group, Inc., 700 F. Supp. 1213, 1234-35 (S.D.N.Y. 1987), aff'd in part and rev'd in part on other grounds, 887 F.2d 399 (2d Cir. 1989).  In the retailer market, Tecnimed has failed to prove any evidence supporting likelihood of confusion among the professional buyers who make purchase decisions, and Kidz-Med's evidence strongly supports the conclusion that such confusion is highly unlikely. Tecnimed's theory of confusion in the consumer internet market assumes that consumers can see the Kidz-Med Thermofocus packaging and compare it with the packaging for Kidz-Med's new thermometers.  Sup. Brief at -5.  Kidz-Med has proved that there are only three merchants left selling the Kidz-Med Thermofocus on the internet and that none of them displays the packaging. Thus Tecnimed has failed to establish any basis of a future likelihood of confusion that would support issuance of a preliminary injunction.

---

[14]    Defendant's continued use of the packaging is evidence of good faith, not bad faith.  As soon as Tecnimed's counsel wrote to defendants counsel in August, 2010, defendants stopped all of the challenged activities other than two things.  Defendants counsel immediately told plaintiff's counsel that defendants were not bound by a non-competition obligation and owned the intellectual property in dispute.  In Eastern America Trio Products, Inc. v. Tang Electronic Corp., 97 F.Supp.2d 395 (S.D.N.Y. 2000) the district court stated:  "On the other hand, it should be noted that defendants secured a patent for their product and openly marketed it in spite of warnings by plaintiff that they were infringing the '465 patent. This indicates that defendants felt they were acting within their rights, and tends to belie a finding of bad faith on their part."

<u>CONCLUSION</u>

For the reasons stated above and in Kidz-Med's earlier papers, the Court should deny

plaintiff's motion for a preliminary injunction in all respects.

Dated: December 4, 2010

Respectfully submitted,

YESKOO HOGAN & TAMLYN, LLP

By: __s/_____
        Richard C. Yeskoo
        Thomas T. Tamlyn
        909 Third Avenue, 28th Floor
        New York, NY 10023
        212-983-0900
        Attorneys for Defendants