UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TECNIMED SRL,

                    Plaintiff,

          - v. –

KIDZ-MED, INC., and
AMERICAN SCIENTIFIC RESOURCES,
INC.,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

10 Civ. 7277 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

  Plaintiff Tecnimed SRL ("Tecnimed") has moved for a preliminary injunction

against Defendants Kidz-Med, Inc. and American Scientific Resources, Inc. ("Kidz-Med"),

alleging that Kidz-Med has infringed Tecnimed's trademarks and trade dress in marketing a

thermometer that competes with Tecnimed's Thermofocus non-contact thermometer.  Tecnimed

seeks an order enjoining Kidz-Med from continuing to sell its product in allegedly infringing

packaging.  For the reasons set forth below, Tecnimed's motion will be GRANTED.

## BACKGROUND

  Plaintiff Tecnimed is the manufacturer of the "Thermofocus 5-in-1" non-contact

thermometer, which permits a parent to take a child's temperature without disturbing the child.

(Cmplt. ¶ 17-18)  The Thermofocus is also marketed for use in measuring the temperature of a

child's food, nursery or bath.  (Bellifemine Decl., Ex. 2)  On March 31, 2008, Tecnimed and

Kidz-Med entered into a distribution agreement (the "Distribution Agreement") under which

Kidz-Med would market and sell the Thermofocus through retail channels.  (Bellifemine Decl.,

Ex. 1, ¶ 8.1)  The Distribution Agreement provided that Kidz-Med would "make use of

Tecnimed's trademarks, trade names or any other symbols . . . for the only purpose of identifying

and advertising the [Thermofocus], within the scope of its activity as distributor of Tecnimed and in Tecnimed's sole interest."  (Bellifemine Decl., Ex. 1, ¶ 8.1)  The Distribution Agreement also provided that Kidz-Med would not "distribute, manufacture or represent any products which are in competition with the [Thermofocus], for the entire term of this contract and for two years after its effective termination."  (Id. ¶ 3.1)

   While the Distribution Agreement was in effect, disputes arose between the parties concerning what Tecnimed characterizes as "Kidz-Med's . . . failure to pay for the Products in full and [Kidz-Med's] inability to meet the volume targets in the Distribution Agreement."  (Cmplt. ¶ 35)  These disputes were resolved in a settlement agreement dated March 6, 2009.  ("Settlement Agreement," Bellifemine Decl., Ex. 5)  The Settlement Agreement terminates the Distribution Agreement "except as otherwise set forth in this Settlement Agreement."  (Id. ¶ 2)  Because, at the time of the Settlement Agreement, Kidz-Med still had a significant inventory of unsold Thermofocus thermometers, the Settlement Agreement provides that "Kidz-Med shall retain the exclusive right to sell in the United States Product to Walgreens, Babies R Us, and any new retailers pre-approved by Tecnimed (the "Exclusivity Retailers") and that Kidz-Med will "continue to exercise reasonable best efforts to market and sell the Product placed at the Exclusivity Retailers."  (Id. ¶ 3(a); 3(d))

   At a June 2010 trade show, Kidz-Med unveiled a prototype for its new "Kidz-Med 5-in-1 Non-Contact Thermometer."  (Bellifemine Decl., Ex. 13)  The new thermometer became available for sale on September 27, 2010.  (Bellifemine Decl. ¶ 40)  According to Kidz-Med's Form S-1, Kidz-Med "received and shipped the first 2,000 unit orders in September 2010 and received and shipped another 10,000 units in October through early November 2010."  (Bellifemine Supp. Decl., Ex. 2, at 27)  The new thermometer's packaging uses the same purple

and blue color scheme and the same slogans as the Thermofocus's packaging, and features similar artwork demonstrating the thermometer's various uses.  (Bellifemine Decl., Ex. 2, Ex. 9)

In addition to using similar packaging for its own thermometer, Kidz-Med took other steps to suggest a relationship between its product and the Thermofocus.  In a January 2010 press release concerning the Thermofocus, Kidz-Med's Director of Business Development falsely suggested that Kidz-Med was planning to release an updated version of the Thermofocus, by stating that "[w]e are excited to see that the media A-list are featuring our non-contact, hygienic thermometer [the Thermofocus] as a must-have during the flu season.  Our new non-contact thermometer will be launching this year, and we hope for similar attention to be drawn to it too."  (Bellifemine Decl., Ex. 24)  Kidz-Med has also used (1) the testimonial of a children's hospital physician to promote its new thermometer, when the physician was actually praising the Thermofocus; (2) FAQs and other testimonials originally used for the Thermofocus in order to promote its own product; and (3) the metatag "Thermofocus" on its website in order to direct prospective Tecnimed customers to Kidz-Med's website.  (Bellifemine Decl., Ex. 18, 29-30) Finally, Tecnimed has presented evidence that, before Kidz-Med began selling its competing thermometer, it promoted the Thermofocus under the name "Kidz-Med 5-in-1 Non-Contact Thermometer," without using the word "Thermofocus."  (Bellifemine Decl. ¶¶ 55-59; Ex. 23-25)

Tecnimed acknowledges that Kidz-Med stopped some of these practices in response to Tecnimed's August 18, 2010 cease-and-desist letter.  For example, Kidz-Med no longer uses FAQs and testimonials concerning the Thermofocus to promote its own product, and has stopped selling the Thermofocus product under the name "Kidz-Med 5-in-1 Non-Contact Thermometer."  (Cmplt. ¶ 71)  However, Kidz-Med has continued to sell its non-contact thermometer in the allegedly infringing packaging.  (Def. Supp. Br. at 16-23)

On September 21, 2010, Tecnimed filed a complaint alleging trademark infringement under 15 U.S.C. § 1125(a), "reverse passing off" under 15 U.S.C. § 1125(a), injury to business reputation under N.Y. Gen. Bus. Law § 360-1, and common law unfair competition and tortious interference.  The Complaint also alleges that the non-compete provision in the Distribution Agreement survived the Settlement Agreement, and that accordingly Kidz-Med's sale of a competing thermometer constitutes breach of contract.  (Cmplt. ¶ 83)

On October 1, 2010, Tecnimed moved by order to show cause for a preliminary injunction (1) enjoining Kidz-Med from selling competing products until at least March 6, 2011, when Tecnimed claims that the non-compete provision expires; (2) enjoining Kidz-Med from using "words, symbols, trade dress or any combination thereof that are likely to cause confusion between the Thermofocus 5-in-1 and Kidz-Med's new thermometer"; and (3) enjoining Kidz-Med from selling the Thermofocus product in the absence of the Thermofocus mark.  (Dkt. No. 2)

On October 29, 2010, this Court held a hearing on Tecnimed's application.  It advised the parties of its preliminary view that "plaintiff's reading of the contract is not well founded," and that in fact the non-compete provision did not survive the Settlement Agreement. (Bellifemine Supp. Decl., Ex. 1, at 5)  However, the Court also advised the parties of its initial impression that "defendants have systematically sought to sow confusion in the marketplace by linking their product in a number of ways with plaintiff's product," and that defendants "nearly copied certain aspects of the packaging utilized on plaintiff's Thermofocus product." (Bellifemine Decl., Ex. 1, at 7-9)

After settlement efforts failed, the parties submitted an additional round of briefing, which was completed on December 14, 2010.  Tecnimed's most recent briefing focuses

solely on Kidz-Med's allegedly infringing packaging.  It does not discuss Kidz-Med's alleged breach of the non-compete clause, and also does not argue that Kidz-Med is continuing to pass off Thermofocus thermometers as Kidz-Med-made products.   Accordingly, this opinion focuses on Tecnimed's claim that Kidz-Med's trade dress for its product infringes Tecnimed's rights in the Thermofocus trade dress.

## DISCUSSION

## I.        PRELIMINARY INJUNCTION STANDARD

In Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010), the Second Circuit applied the preliminary injunction standard set forth in eBay v. MercExhange, L.L.C., 547 U.S. 388, 390 (2006), in the copyright context.  In doing so, the court stated that "eBay strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context," and that "we see no reason that eBay would not apply with equal force to an injunction in any type of case."  Salinger, 607 F. 3d at 78, 78 n.7 (emphasis in original).  Accordingly, this Court will apply the eBay standard here.

Under the eBay standard:

First . . . a court may issue a preliminary injunction . . . only if the plaintiff has demonstrated "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor."  Second, the court may issue the injunction only if the plaintiff has demonstrated "that he is likely to suffer irreparable injury in the absence of an injunction."  The court must not adopt a "categorical or "general" rule or presume that the plaintiff will suffer irreparable harm (unless such a departure from the long tradition of equity practice was intended by Congress).  Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury."  Third, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.  Finally, the court must ensure that the "public interest would not be disserved" by the issuance of an injunction.

Salinger, 607 F.3d at 79-80 (internal citations omitted).

## II.    LIKELIHOOD OF SUCCESS

To prevail in a trademark infringement action, a plaintiff must show "both that its mark is protectable and that there is 'a probability [likelihood] of confusion' affecting 'numerous ordinary prudent purchasers.'" New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 329 (S.D.N.Y. 2010) (quoting Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993)).

### A.    Ownership of the Intellectual Property

With respect to the first prong – ownership of a protectable mark – the parties' principal dispute is about which party is the true owner of this intellectual property.  Kidz-Med argues that, because the parties' contract is not dispositive on this issue, "ownership of trademarks and trade dress is determined by analysis of the Wrist Rocket factors."  (Def. Supp. Br. 16 (citing Wrist-Rocket Mfr. Co. v. Saunders, 379 F. Supp. 902, 909 (D. Neb. 1974)))  Wrist Rocket sets forth a six-factor test for determining whether a manufacturer or distributor owns a trademark.  The Wrist Rocket analysis was modified in Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1220 (9th Cir. 1991), and Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d 586 (S.D.N.Y. 2001), to include only four factors.  Sengoku, 96 F.3d at 1220;  Tactica, 154 F. Supp. 2d at 600.  Tecnimed maintains that the modified Sengoku – Tactica framework should govern the determination of ownership here.  Because Kidz-Med relies on Sengoku and Tactica, it has implicitly conceded that the modified Wrist Rocket analysis applies.

Under the modified Wrist Rocket test, "[w]hen disputes arise between a manufacturer and distributor, courts will look first to any agreement between the parties regarding trademark rights."  Sengoku, 96 F.3d at 1220.  However, "[i]n the absence of an agreement between the parties, the manufacturer is presumed to own the trademark."  Id. (citing

Energy Jet, Inc. v. Forex Corp., 589 F. Supp. 1110, 1116 (E.D. Mich. 1984); Wrist-Rocket Mfg.

Co. v. Saunders, 379 F. Supp. at 909).

        An exclusive distributor may rebut this presumption by showing that it gave the

goods "the benefit of its reputation or of its name and business style." Tactica Int'l, Inc., 145 F.

Supp. 2d at 600.  Relevant to consideration of this issue is "(1) which party invented and first

affixed the mark onto the product; (2) which party's name appeared with the trademark; (3)

which party maintained the qualify and uniformity of the product; and (4) with which party the

public identified the product and to whom purchasers made complaints." Sengoku, 96 F.3d at

1220 (citing Omega Nutrition v. Spectrum Marketing, 756 F. Supp. 435, 438 (N.D. Cal. 1991)).

The court will also consider "which party possesses the goodwill associated with the product, or

which party the public believes stands behind the product." Sengoku, 96 F.3d at 1220 (citing

Premier Dental Prods. v. Darby Dental Supply Co., 794 F.2d 850, 854 (3d Cir. 1986)).  These

factors reflect the principle that "actual use in connection with a particular business" is the

primary consideration in establishing ownership of a trademark.  G's Bottoms Up Social Club v.

E.P.M. Indus., 574 F. Supp. 1490, 1495 (S.D.N.Y. 1983); see also Montgomery v. Kalak Water

Co., Inc., 196 F. Supp. 173, 177 (S.D.N.Y. 1961).

        Here, the Settlement Agreement does not resolve ownership of the disputed trade

dress.  While the Settlement Agreement provides that "[t]he right to use Tecnimed's trademarks,

trade names or symbols . . . shall cease immediately for the Distributor, on expiration or effective

termination . . . of the present contract" (Bellifemine Decl., Ex. 5, ¶ 8.3), this language does not

resolve the question, because Kidz-Med contends that the trade dress used for the Thermofocus

was never Tecnimed's property.  Tecnimed, as the manufacturer of the product, is entitled to a

presumption that it owns the trade dress that Kidz-Med used to market the Thermofocus,

Sengoku, 96 F.3d at 1220, but Kidz-Med may rebut this presumption by showing that analysis of

the four Sengoku factors demonstrates its "superior right of ownership."  Id.; see also Tactica,

154 F. Supp. 2d at 600.

           Kidz-Med has made no such showing here.  Kidz-Med has argued throughout this

litigation that it, not Tecnimed, was responsible for creating components of the trade dress.  (Def.

Br. at 19-20; Supp. Br. at 19)  However, Kidz-Med has produced little evidence to support this

argument.  While Kidz-Med notes that the packaging changed considerably after the parties

entered into the Distribution Agreement (see Bellifemine Decl., Ex. 3; Tirotta Decl., Ex. 3), this

fact does not establish that Kidz-Med was solely responsible for these changes.  Moreover,

Tecnimed has offered evidence that it had conceived of many of the salient features of the trade

dress – such as the purple and blue color scheme; the phrase "5 in 1"; the photograph of the

mother holding a sleeping baby; and the five small illustrations depicting a child, bottle, formula,

nursery, and bathwater – before Kidz-Med became its distributor.  (Bellifemine Decl., Ex. 3;

Bellifemine Reply Decl., Ex. 7)  Accordingly, the first Sengoku factor – which party developed

the trade dress – favors Tecnimed.

           With respect to the second Sengoku factor – which party's name appeared

alongside the product – a small Kidz-Med logo appears in the bottom left corner of the

Thermofocus packaging.  The largest and most prominent name on the packaging is

"Thermofocus," however, which is indisputably Tecnimed's trademark and product name.

(Bellifemine Decl., Ex. 3)  Accordingly, the trade dress is closely associated with

"Thermofocus," and by extension with Thermofocus's manufacturer and trademark registrant.

Because the name "Tecnimed" does not appear on the packaging, however, the Court will treat

this factor as a draw.  See Sengoku, 96 F.3d at 1221 (finding that jury reasonably found that

manufacturer owned trademark – even though only distributor's name appeared on the product and its packaging – where manufacturer first affixed the trademark on the product).

As for the final two <u>Sengoku</u> factors, Kidz-Med does not dispute that Tecnimed manufactured the goods and exercised control over their nature and quality.  (Def. Supp. Br. at 20)  However, Kidz-Med has presented persuasive evidence that it, not Tecnimed, handled customer complaints.  (Tirotta Supp. Decl. ¶ 21-23, Ex. 12)

In sum, two of the <u>Sengoku</u> factors favor Tecnimed, one favors Kidz-Med, and the other is a draw.  This showing is insufficient to overcome the presumption that Tecnimed, the manufacturer, owns the trade dress.  Accordingly, the Court finds that Tecnimed has demonstrated a likelihood of success on the question of which party owns the trade dress.

### B.      Protectability of the Trade Dress

Kidz-Med also argues that certain aspects of the trade dress are not protectable under the Lanham Act.  Whether a mark is protectable depends on whether it is "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."  <u>New York City Triathlon, LLC v. NYC Triathlon Club, Inc.</u>, 704 F. Supp. 2d 305, 329 (S.D.N.Y. 2010) (citing <u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 9 (2d Cir. 1976)).  Generic marks are never protected, while suggestive, arbitrary, and fanciful marks always are.  <u>New York City Triathlon, LLC</u>, 704 F. Supp. 2d at 329.  A descriptive mark, which is "one that tells something about a product, its qualities, ingredients or characteristics," is "entitled to protection upon proof that it has obtained a secondary meaning, that is to say,  an identity that consumers associate with a single source, even though the source itself may be unknown."  <u>Gruner + Jahr USA Publ'g</u>, 991 F.2d at 1076.  Kidz-Med argues that certain features of the trade dress – such as "the words '5-in-1 non contact thermometer,' 'no need to touch, startle, upset or wake your child,' '5-in-1

measures any temperature,' and 'child, food, formula, bath and nursery'" – are generic, or are descriptive and lack secondary meaning.  (Def. Supp. Br. at 21)

 Tecnimed's claim in this action, however, is that the packaging and overall presentation of its product, known as its "trade dress," is infringed by Kidz-Med's presentation of its competing product.  "A product's trade dress is its 'total image . . . includ[ing] features such as size, shape, color or color combinations, texture, [or] graphics.'"  <u>Paddington Corp. v. Attiki Imports & Distributors, Inc.</u>, 996 F.2d 577, 582 (2d Cir. 1993) (quoting <u>LeSportsac, Inc. v. K Mart Corp.</u>, 754 F.2d 71, 75-76 (2d Cir. 1985)).  Furthermore, "[s]ince the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive, and the only real question for the courts will be whether there is a likelihood of confusion between the products."  <u>Id.</u> at 583 (citing <u>Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.</u>, 659 F.2d 695, 703 (5th Cir 1981)).

 The fact that a product's trade dress incorporates common elements -- such as the phrase "5-in-1 measures any temperature"-- does not demonstrate that the trade dress as a whole is generic.  Even where "each of these elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness."  <u>Paddington Corp.</u>, 996 F.2d at 584; <u>see also</u> <u>LeSportsac, Inc.</u>, 754 F.2d at 76 (finding that sports bag was nonfunctional, and therefore entitled to trademark protection, "when viewed in its entirety").  The logic behind this rule is that "[o]ne could no more deny protection to a trade dress for using commonly used elements than one could deny protection to a trademark because it consisted of a combination of commonly used letters of the alphabet."  <u>Paddington Corp.</u>, 996 F.2d at 584.

As is "typically" the case, see id. at 583, the Thermofocus packaging at issue here is inherently distinctive. While some aspects of the packaging are descriptive of features of the product – such as "No need to touch, startle, upset or wake your child" and the list of five common uses of the thermometer – and thus may not, standing alone, be entitled to trademark protection, the packaging's "overall appearance," id. at 584, is inherently distinctive "when viewed in its entirety." LeSportsac, Inc., 754 F.2d at 76. Accordingly, Tecnimed has demonstrated a likelihood of success on the question of whether the trade dress at issue is protectable.

### C.    **Likelihood of Consumer Confusion**

The Court must next consider whether there is "'a probability [likelihood] of confusion' affecting 'numerous ordinary prudent purchasers.'" New York City Triathlon, LLC, 704 F. Supp. 2d at 329 (quoting Gruner + Jahr USA Publ'g, 991 F.2d at 1077)).

In determining whether there is a likelihood of consumer confusion, courts in this circuit consider eight factors:  "'[The] strength of the mark, the degree of similarity between the marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.'" Thompson Medical Co. v. Pfizer, Inc., 753 F.2d 208, 213 (2d Cir. 1985) (quoting Polaroid Corp. v. Polarad Elects. Corp., 287 F.2d 492, 495 (2d Cir. 1961)).  "[A]pplication of the Polaroid test need not be rigid, [but] it is nevertheless 'incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why.'" New Kayak Pool Corp. v. R & P Pools, Inc., 246 F.3d 183, 185 (2d Cir. 2001) (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 391 (2d Cir. 1995)).  Although "no single factor is determinative," Plus Prods. v. Plus Discount Foods, Inc., 722 F.2d 999, 1004 (2d Cir. 1983), "the first three factors are 'perhaps the

11

most significant.'"  New York City Triathlon, 704 F. Supp. 2d at 341 (quoting Mobil Oil Corp.

v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987)).

### 1.   **Strength of the Mark**

A mark's strength "may be measured in two . . . different ways:  (1) inherent

strength, resulting from the mark's degree of inherent distinctiveness, usually measured on the

ladder ranging from unprotectable generic marks to arbitrary, fanciful marks . . . [and] (2)

acquired strength, reflecting the degree of consumer recognition the mark has achieved."  New

York City Triathlon, 704 F. Supp. 2d at 333; see also W.W.W. Pharmaceutical Co., Inc. v.

Gillette Co., 984 F.2d 567, 572 (2d Cir. 1993) ("[A] mark's strength is assessed using two

factors:  (1) the degree to which it is inherently distinctive; and (2) the degree to which it is

distinctive in the marketplace.").  "The 'inquiry regarding the strength of a mark often parallels

the inquiry concerning the mark's validity, inasmuch as the "strength of distinctiveness of a mark

determines both the ease with which it may be established as a valid trademark and the degree of

protection it will be accorded."'"  Lee Myles Auto Group v. Fiorillo, 2010 U.S. Dist. LEXIS

91582, at *11 (S.D.N.Y. Aug. 25, 2010) (quoting Arrow Fastener Co., Inc. v. Stanley Works, 59

F.3d 384, 391 (2d Cir. 1995) (quoting McGregor-Doninger, Inc. v. Drizzle Inc., 599 F.2d 1126,

1136 (2d Cir. 1979))).  However "'suggestiveness alone does not necessarily determine the

strength of a mark'"; the court "must also 'consider distinctiveness in the marketplace.'"  Miss

Universe v. Villegas, 672 F. Supp. 2d 575, 584 (S.D.N.Y. 2009) (quoting Medici Classic Prods.

v. Medici Group, 590 F. Supp. 2d 548, 554 (S.D.N.Y. 2008)).

Kidz-Med's deliberate efforts to foster confusion between Thermofocus and its

own product also suggest that it believes that the Thermofocus brand has acquired some degree

of consumer recognition.  Here the Court finds that the Thermofocus packaging is highly

distinctive, given, inter alia, its color scheme, the images used to convey the product's uses, the

arrangement of that imagery, and the "catch phrases" used to distinguish the product in consumers' minds.  Accordingly, this factor favors Tecnimed.

> ### 2.      Similarity of the Marks

"'In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'"  Star Indus. v. Bacardi & Co., 412 F.3d 373, 386 (2d Cir. 2006) (quoting Gruner + Jahr, 991 F.2d at 1078)).  Although there are subtle differences between the packaging of the two products – for example, in the listing of the thermometer's five uses, the phrasing and sequence are somewhat different – this factor still favors Tecnimed, because "the parties' [products] are not only within the same narrow category of goods directed at the same set of consumers, they are strikingly similar in design."  THOIP v. Walt Disney Co., 2010 U.S. Dist. LEXIS 82726, at *48 (S.D.N.Y. Aug. 13, 2010).  Moreover, the Second Circuit has "repeatedly held that the appropriate test for similarity of trade dress is the overall impression of the products and the entirety of the trade dress, and that a mark may not be dissected in order to prove similarity [or dissimilarity]."  Nora Bevs. v. Perrier Gr., 269 F.3d 114, 122 (2d Cir. 2001); see also Brennan's, Inc. v. Brennan's Restaurant, L.L.C., 360 F.3d 125, 133 (2d Cir. 2004) ("juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar").

Here, the packaging for the Thermofocus and for the new Kidz-Med product create a similar "overall impression."  Star Indus., 412 F.3d at 386.  Both products feature a purple and blue color scheme with a prominently placed photo of a mother taking a baby's temperature.  Both include the phrase "NeverWake Technology," closely followed by "No need to touch, startle, upset or wake your child."  Both packages feature small illustrations of the product's five principal uses in the bottom right corner, along with the phrase "5-in-1 Measure

Any Temperature."  Finally, both packages include four bullet points in white font highlighting positive aspects of the product, such as "Pediatrician recommended" and "Safe, hygienic, and easy to use."  (Bellifemine Decl., Ex. 2, Ex. 9)  These similarities appear on a small piece of product packaging.  Given the many similarities, "the overall impression of the products" is similar, and this factor thus favors Tecnimed.[1]

### 3.     Similarity of Services/ Bridging the Gap

The next factor is "the proximity of the products."   This factor "concerns whether and to what extent the two products compete with each other," and requires the court to "look to 'the nature of the products themselves and the structure of the relevant market.'"  Cadbury Beverages v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996) (quoting Vitarroz v. Borden, Inc., 644 F.2d 960, 967 (2d Cir. 1981)).  Here, the products are essentially identical as to function and market:  both are non-contact thermometers that read temperature when in proximity to the subject, and both are marketed for use in measuring a baby's food, bathwater and nursery as well as its body temperature.

Kidz-Med's conduct illustrates how closely the two products compete.  In a January 12, 2010 press release, Kidz-Med attempted to capitalize on the attention the Thermofocus had received in the medical community:  the company's Director of Business Development said, "We are excited to see that the media A-list are featuring our non-contact,

---

[1]  Kidz-Med notes that the Thermofocus units currently on the market were distributed by another distributor, and that the packaging for these units does not at all resemble the packaging at issue in this lawsuit.  (Yeskoo Supp. Decl., Ex. 9)  This is not the proper point of comparison. As the Court stated at the October 29 hearing, "I don't think the problem is so much in what the similarities are between Tecnimed's packaging now versus what [Kidz-Med's] packaging is now, but rather the similarities between [Kidz-Med's] packaging now and the packaging that was utilized back when [Kidz-Med was] acting as [Tecnimed's] distributor."  (Bellifemine Supp. Decl., Ex. 1, at 29)  The concern is that those similarities will lead consumers to purchase the Kidz-Med product because they incorrectly believe it is associated with the Thermofocus, thus diverting sales that rightfully belong to Tecnimed.

hygienic thermometer [i.e., the Thermofocus] as a must-have during the flu season.  Our new non-contact thermometer will be launching this year, and we hope for similar attention to be drawn to it too."  (Bellifemine Decl., Ex. 24)  This remark reflects not only Kidz-Med's efforts to capitalize on the positive reputation of the Thermofocus, but also its understanding that its new thermometer would occupy the same market niche as the Thermofocus.  Moreover, in its August 2010 SEC Rule 15c2-11 disclosure materials, Kidz-Med referred to the Thermofocus as a "direct competitor" of its product.  (Bellifemine Decl., Ex. 15, at 23)  Accordingly, this factor favors Tecnimed.

The fourth factor, related to similarity of services, is "the likelihood that the plaintiff will 'bridge the gap' and offer a product or service similar to the defendant's."  <u>Polaroid Corp.</u>, 287 F.2d at 495.  Because, as explained above, the parties' products are virtually identical as to function and market, there is no gap to bridge and this factor also favors Tecnimed.

### 4.   <u>Actual Confusion</u>

The next factor to be considered is whether, and to what extent, the plaintiff has demonstrated actual confusion among consumers regarding the origin of the defendant's product.  Tecnimed has presented evidence that one consumer believed that the Kidz-Med thermometer was a new version of the Thermofocus.  That consumer wrote the following review of Kidz-Med's thermometer on Amazon.com:  "I bought the original 5and1 when we recently had a baby last year.  When they came out with [their] new one, I had to try it.  I just got it and WOW it's even better!"  (Bellifemine Decl., Ex. 31)  Tecnimed has also presented evidence that the new Kidz-Med thermometer is being identified with "Tecnimed" and "Thermofocus" in connection with online sales in Japan, leading to an angry call from Plaintiff's Japanese distributor.  (Supp. Bellifemine Decl. ¶ 21, Ex. 10)

However, two instances of consumer confusion are not sufficient to satisfy the "actual confusion" prong of the Polaroid test.  See Nora Beverages, Inc. v. Perrier Group of America, 269 F.3d 114, 124 (2d Cir. 2001) ("[W]e do not believe that the district court erred in finding that two anecdotes of confusion over the entire course of competition constituted de minimis evidence insufficient to raise triable issues [regarding actual confusion]."  This is true even where there is evidence that a sophisticated customer was confused about the product's origin.  See C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 F.2d 14, 18 (2d Cir. 1985) (two letters from advertising agencies insufficient to demonstrate actual confusion).  Because Tecnimed has offered only two instances of actual consumer confusion, the Court cannot find that it has demonstrated a likelihood of success on the "actual confusion" prong of the Polaroid test.

### 5.   **Bad Faith**

The bad faith factor "examines whether defendants 'adopted [their] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [their] and [plaintiff's] product.'"  Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 745 (2d Cir. 1998) (quoting Lang v. Retirement Living Pub. Co., Inc., 949 F.2d 576, 583 (2d Cir. 1991)).  Here, there is substantial evidence that Kidz-Med has intentionally capitalized on Thermofocus's reputation and fostered confusion among consumers between the Thermofocus and Kidz-Med's product.  In launching its product, Kidz-Med issued a misleading press release linking its new product with the Thermofocus, and utilized a testimonial concerning the Thermofocus from a children's hospital physician.  (Bellifemine Decl., Ex. 18, 24, 29-30)  It has used FAQs and testimonials prepared, obtained and employed for the Thermofocus in order to promote its new

16

product, and used the metatag "Thermofocus" on its website in order to direct prospective

Tecnimed customers to its own website.  (Bellifemine Decl., Ex. 18, 20)

Finally, Kidz-Med – before it began selling its competing thermometer –

promoted the Thermofocus under the name "Kidz-Med 5-in-1 Non-Contact Thermometer,"

without using the name "Thermofocus."  (Bellifemine Decl. ¶ 55-59; Ex. 23-25)  In other words,

Kidz-Med "passed off" the Thermofocus as if Kidz-Med, rather than Tecnimed, had

manufactured the product.  Although Kidz-Med stopped these deceptive practices after receiving

Tecnimed's August 2010 cease-and-desist letter, these practices demonstrate Kidz-Med's intent

to "'capitaliz[e] on plaintiff's reputation and goodwill.'"  Streetwise Maps, Inc., 159 F.3d 739,

745 (quoting Lang, 949 F.2d at 583).  Accordingly, Tecnimed has demonstrated a likelihood of

success on the "bad faith" prong of the Polaroid test.

### 6.  **Quality of Goods and Services**

This factor requires the Court to "consider[] whether the senior user's reputation

could be 'tarnished by [the] inferior merchandise of the junior user.'"  Cadbury Beverages v.

Cott Corp., 73 F.3d 474, 483 (2d Cir. 1996) (quoting Scarves by Vera, Inc. v. Todo Imports Ltd.,

544 F.2d 1167, 1172 (2d Cir. 1976)).  Tecnimed has offered evidence that Kidz-Med's product is

inferior in its accuracy, appearance and instruction manual when compared to the Thermofocus.

(Bellifemine Decl., Ex. 37)  In addition, Tecnimed notes that the Thermofocus is outfitted with a

"patented aiming system that shows the user of the thermometer exactly how far from the

forehead the thermometer should be held in order to obtain an accurate temperature reading,"

while the Kidz-Med thermometer has no such technology, leading to a high risk of user error.

(Bellifemine Supp. Decl. ¶ 26-28, Supp. Ex. 12)

Kidz-Med disputes Tecnimed's claim that the Kidz-Med thermometer is an inferior product.  Kidz-Med notes that its product has received "510(k) clearance" from the FDA, reflecting that agency's determination "that the device meets . . .  the accuracy standards of the American Society for Testing and Material."  (Tirotta Supp. Decl. ¶ 12-13, Ex. 9)  Moreover, Kidz-Med maintains that the Thermofocus has "a return rate ranging between 2 ½ percent to 4 percent because of user complaints of inaccuracy."  (Tirotta Supp. Decl. ¶ 21, Supp. Ex. 12)

Because of the conflicting evidence on this point, Tecnimed has not demonstrated a likelihood of success on this prong of the <u>Polaroid</u> test.

### 7.        Sophistication of Consumers

This factor is "grounded on the belief that unsophisticated consumers aggravate the likelihood of confusion."  <u>Simon & Schuster v. Dove Audio</u>, 970 F. Supp. 279, 300 (S.D.N.Y. 1997).  Here, the primary market for non-contact thermometers appears to be parents of small children.

Courts generally conclude that consumers of common household products are not sophisticated consumers for purposes of the <u>Polaroid</u> test.  <u>See</u>, <u>e.g.</u>, <u>Guinness United Distillers & Vintners v. Anheuser-Busch, Inc.</u>, 2002 U.S. Dist. LEXIS 12722, at *18-19 (S.D.N.Y. July 12, 2002) (scotch and beer); <u>Sara Lee Corp. v. Airs Indus., Inc.</u>, 2001 WL 607005, at *5  (S.D.N.Y. Jan. 4, 2001) (women's underwear).  Here, the thermometers in question are common household products not marketed to consumers with any special expertise.  Accordingly, this factor favors Tecnimed.

*             *             *             *

Six of the <u>Polaroid</u> factors favor Tecnimed, including the most significant factors: strength of the mark, degree of similarity, and proximity of the products.   Because Tecnimed has

also shown that the trade dress in question is entitled to protection and that it, rather than Kidz-Med, owns the trade dress, it has demonstrated a likelihood of success on the merits of its trademark infringement claim.

## III.   PLAINTIFF'S SHOWING OF IRREPARABLE INJURY

Under the Salinger standard, the court "must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm (unless such a 'departure from the long tradition of equity practice' was intended by Congress)." Salinger, 607 F.3d at 80 (quoting Winter v. Natural Resources Defense Council, 129 S. Ct. 365, 374 (2008); eBay, 547 U.S. at 391)). Instead, "plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." Salinger, 607 F.3d at 82.

Tecnimed seeks an order

enjoining the Defendants from . . . [m]arketing or selling the Kidz-Med thermometer using words, symbols, trade dress or any combination thereof that are likely to cause confusion between the Thermofocus 5-in-1 and Kidz-Med's new non-contact thermometer, including . . . using the current packaging for the Kidz-Med product; [or] . . . using in its packaging or promotional materials the phrases "5-in-1 Non-Contact Thermometer," "Never Wake Technology," "No need to touch, startle, upset or wake your child," "5-in-1 Measures Any Temperature," "Child, Food, Formula, Bath and Nursery," or Tecnimed artwork showing these five uses of the Product.

Tecnimed argues that, absent an injunction, it will suffer three types of irreparable harm. First, it claims that the loss to Tecnimed resulting from the infringing packaging will be "'difficult to replace or difficult to measure.'" (Pltf. Supp. Br. at 3 (quoting Salinger, 607 F.3d at 81)). Second, it claims that Kidz-Med is insolvent and that "'obligations owed by insolvents'" constitute irreparable harm. (Pltf. Supp. Br. at 4 (quoting Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249-50 (2d Cir. 1999)). Third, it claims that it will suffer a "'[p]rospective loss of [] goodwill'" which is sufficient, standing alone, to support a finding of

irreparable harm.  (Pltf. Supp. Br. at 4 (quoting New York City Triathlon, 704 F. Supp. 2d at 343))

### A.    Losses That Are Difficult to Quantify

The Salinger court noted that "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure."  Salinger, 607 F.3d at 81; see also Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004) (citing Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999)) ("[I]rreparable harm may be found where damages are difficult to ascertain and measure.")

The Kidz-Med thermometer costs $39.99, while the Thermofocus is sold for $99.99.  (Bellifemine Reply Decl., Ex. 9)  Accordingly, consumers who mistake the Kidz-Med product for a second-generation Thermofocus – and judging by the Polaroid test, such consumers are likely to exist – are less likely to purchase the real Thermofocus 5-in-1, when they can purchase what appears to be the same product from the same manufacturer for much less.[2]  Retailers, in turn, may decide to stock the Kidz-Med product in greater numbers than, or instead of, the Thermofocus, resulting in a significant loss of business for Tecnimed.  Such damages are inherently difficult to quantify, because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."  Ticor Title Ins. Co., 173 F.3d at 69.  Such damages are also particularly likely here given (1) the sharp price

---

[2] Tecnimed also claims that its loss of sales to Kidz-Med will be exacerbated by the fact that "most [large retail stores] will carry in their stores only one non-contact thermometer at a time because of limited shelf space,"  and "the manufacturer that first succeeds in getting an in-store placement for its product often effectively blocks any other manufacturer from getting a placement in the same store for several years."  (Bellifemine Supp. Decl. ¶ 3)  Kidz-Med, however, has offered evidence that a number of retailers sell more than one brand of non-contact thermometer.  (Tirotta Supp. Decl. ¶ 11)  Assuming arguendo that stores will stock both products, it is still likely that consumer confusion regarding the Kidz-Med product will lead to a loss of Thermofocus sales, which will be difficult to quantify.

differential between the two products; and (2) the high probability of consumer confusion indicated by application of the Polaroid factors.  Accordingly, Tecnimed has shown that it is likely to suffer unquantifiable sales losses as a result of Kidz-Med's infringing conduct.

Kidz-Med disputes irreparable harm on two grounds.  First, it notes that the first-level purchasers of the thermometers are large retail outlets, which are sophisticated buyers and are not easily confused.  (Def. Supp. Br. at 4 (citing W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 576 (2d Cir. 1993)); O'Leary Decl. ¶ 11).  However, because Kidz-Med previously distributed the Thermofocus, "[i]t is only natural . . . that some of these retailers – who for years regularly interacted with Kidz-Med as the distributor of the Thermofocus 5-in-1 – will now consider the new product distributed by Kidz-Med to be an affiliate or second generation version of the Thermofocus 5-in-1."  (Bellifemine Supp. Decl. ¶ 10)  Accordingly, even assuming arguendo that retailers are more discerning than individual consumers about the sources of products, the parties' previous manufacturer-distributor relationship is likely to engender confusion about the source of the new thermometer.  In addition, Tecnimed has presented evidence that one overseas distributor mistook the Kidz-Med thermometer for a new incarnation of the Thermofocus.  (Bellifemine Supp. Decl. ¶ 21)  Accordingly, Kidz-Med's claim that retailers are sophisticated buyers is insufficient to overcome Tecnimed's showing of a likelihood of confusion.

Tecnimed has also offered evidence that it and Kidz-Med are selling competing thermometers directly to consumers over the internet.  (Bellifemine Supp. Decl. ¶ 18-20; Supp. Ex. 8-9)  Given the inherent risk of confusion between the products as indicated by the Polaroid test, there is a likelihood that a consumer shopping for a non-contact thermometer over the internet would conclude that the new Kidz-Med thermometer is simply a less costly – but

related – model of the Thermofocus.  In sum, Tecnimed has shown that there is a risk of confusion at both the individual consumer and retailer levels.

In contesting Tecnimed's claim that it will suffer irreparable harm, Kidz-Med also argues that Tecnimed is no longer actively selling the Thermofocus through any distributors. Kidz-Med claims to have "canvassed all the major retailers" and to have found no "appreciable sales of the Thermofocus in the United States." (Tirotta Decl. ¶ 13)  However, Tecnimed has offered evidence that its Thermofocus thermometers are on sale at both "brick-and-mortar" retail outlets and on the internet.[3]  (Bellifemine Reply Decl. ¶ 13, Ex. 9, Ex. 10; Bellifemine Supp. Decl. ¶ 6, Ex. 2 at 19)  Accordingly, Kidz-Med's claim that Tecnimed has limited sales does not defeat Tecnimed's showing that it is at risk of irreparable injury from diverted sales.

Although Salinger indicates that a party may satisfy the "irreparable injury" standard by demonstrating losses that are "difficult to measure," Salinger, 607 F.3d at 81, the Court will also consider the other bases for Tecnimed's claim that it will suffer irreparable injury in the absence of an injunction.

**B.    Injury Resulting from Kidz-Med's Insolvency**

Tecnimed also claims that it will suffer irreparable injury – absent an injunction – because Kidz-Med is insolvent and will not be able to pay money damages to compensate Tecnimed.  "As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm." Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999)  However, "courts have

---

[3]  Even assuming that the Thermofocus thermometers currently on sale represent "close-out" models that were purchased and distributed by Kidz-Med, Kidz-Med has acknowledged in its Form S-1 that it is contractually obligated to split the proceeds of such sales with Tecnimed. (Bellifemine Supp. Decl. ¶ 23; Ex. 2 at 19)  Accordingly, Kidz-Med cannot use the fact that these units have passed through an intermediate distribution channel to claim that Tecnimed has no outstanding interest in whether consumers buy the Thermofocus.

excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents."  Id. at 250 (citing American Hosp. Supply Corp. v. Hospital Prods., Ltd., 780 F.2d 589, 594 (7th Cir. 1986)).

In support of its insolvency argument, Tecnimed offers Kidz-Med's Form S-1, which states that "our independent registered auditors have expressed substantial doubt about our ability to continue as a going concern," and that "[w]e currently have sufficient cash to sustain our operations for a period of approximately one month."  (Pltf. Supp. Br. at 9; Bellifemine Supp. Decl., Ex. 2, at 7, 4)  Kidz-Med claims that the insolvency exception does not apply here, relying on Meringolo v. Power2ship, 2003 WL 21750009, at *3-4 (S.D.N.Y. July 28, 2003) and General Transp. Servs., Inc. v. Kemper Ins. Co., 2003 WL 21730635, at *3-4 (N.D.N.Y. June 25, 2003).  (Def. Supp. Br. at 10)  These cases are not on point.

In Meringolo, the court noted that the defendant's share price had increased 49 percent over the previous four months and that its financial condition had "markedly improved" over the previous fourteen months.  Meringolo, 2003 WL 21750009, at *4.  In Kemper, the plaintiff had merely "assert[ed]" that there was a risk of insolvency and had not "establish[ed] that [the defendant was] in 'imminent' danger of becoming insolvent."  Kemper, 2003 WL 2173635, at *4.  Here, by contrast, Tecnimed has presented Kidz-Med's Form S-1 stating that it will run out of cash in one month's time.  Kidz-Med has not rebutted this proof in any fashion. In sum, Tecnimed has demonstrated that it will likely suffer irreparable injury as a result of Kidz-Med's inability to pay a damages award.

### C.  Harm to Goodwill

Tecnimed also argues that it will suffer "irreparable harm to the goodwill associated with the Thermofocus 5-in-1."  (Pltf. Supp. Br. at 5)  Courts have found that "[p]rospective loss of [] goodwill alone is sufficient to support a finding of irreparable harm."

New York City Triathlon, LLC, 704 F. Supp. 2d at 343.  This aspect of Tecnimed's irreparable harm argument is tied to its claim that the new Kidz-Med product is inferior to the Thermofocus 5-in-1. (Pltf. Supp. Br. at 5)

As discussed above in connection with the Polaroid analysis, the evidence concerning the products' relative quality is inconclusive.  Citing the risk of user error and other alleged flaws, Tecnimed has credibly argued that Kidz-Med's product is inferior to the Thermofocus.  (Bellifemine Decl., Ex. 37; Bellifemine Supp. Decl. ¶ 26-28, Ex. 12)  Kidz-Med has likewise offered credible evidence on this point, however, including proof of user dissatisfaction with the Thermofocus.  (Tirotta Supp. Decl. ¶ 12-13, ¶ 21, Ex. 9)  Given the competing evidence, this Court cannot make a finding at this stage as to which product is superior.

*          *          *          *

Although Tecnimed has not demonstrated that it will suffer irreparable injury in the form of lost goodwill, it has shown that (1) it faces a risk of loss that will be difficult to quantify; and (2) Kidz-Med's insolvency creates a significant risk that it will be unable to pay money damages at the conclusion of this litigation.  Under Salinger, this showing is adequate to demonstrate a risk of irreparable injury.

## IV.   **BALANCE OF HARDSHIPS**

Where a plaintiff – as here – has demonstrated a likelihood of success on the merits of its trademark infringement claim, and has demonstrated likely irreparable injury in the absence of an injunction, the Court must next  "consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor."  Salinger, 607 F.3d at 80.  Tecnimed requests an order "enjoining the Defendants from . . . [m]arketing or selling the Kidz-Med thermometer using words, symbols,

24

trade dress or any combination thereof that are likely to cause confusion between the Thermofocus 5-in-1 and Kidz-Med's new non-contact thermometer."  (Order to Show Cause (Dkt. No. 3))  Tecnimed's proposed injunction would require (1) prospective changes in Kidz-Med's packaging, so as to eliminate the risk of consumer confusion regarding the product's origin; and (2) a recall of the infringing Kidz-Med units that have already been shipped to retailers.  The balance of hardships as to each form of relief is discussed below.

### A.   Prospective Change in Packaging

Kidz-Med estimates the cost of prospective changes to its packaging as follows: "If the Court orders Kidz-Med to redo its packaging, we estimate the cost would be $10,000 for graphic arts services and $25,000 for printing 100,000 new inserts."  (Tirotta Supp. Decl. ¶ 26) Tecnimed has offered evidence that the graphic arts cost would be approximately $3,000. (Bellifemine Supp. Decl. ¶ 47)

Given the potential harm to Tecnimed (see Part III, supra), and the modest cost to Kidz-Med of making prospective changes to its packaging, the Court concludes that the balance of hardships favors Tecnimed.[4]

### B.   Recall

Tecnimed also seeks an order requiring Kidz-Med to "replace the packaging on the products already shipped or already packaged and in Defendants' inventory."  (Pltf. Supp. Br. at 9) [5]

---

[4]  While Tecnimed seeks an injunction barring Kidz-Med from "using in its packaging or promotional materials the phrases '5-in-1 Non-Contact Thermometer,' 'NeverWake Technology,' 'No need to touch, startle, upset or wake your child,' '5-in-1 Measures Any Temperature,' [or] 'Child, Food, Formula, Bath and Nursery'" (Dkt. No. 3), this Court will not grant Tecnimed exclusive ownership of these common phrases.  Instead, the Court will enter an order requiring Kidz-Med to repackage its product in such a way as to eliminate the risk of consumer confusion.

Kidz-Med asserts that a recall would involve about 4,000 units, spanning five retailers with more than 1,000 stores.  (Tirotta Supp. Decl. ¶ 27)  According to Kidz-Med, in addition to the cost of repackaging the units, Kidz-Med would also be responsible for various fees charged by retailers for administration, labor, shipping, lost sales, and restocking. (O'Leary Decl. ¶ 15-17; Tirotta Supp. Decl. ¶ 27)  Kidz-Med estimates that a recall will cost $95,000.  (Tirotta Supp. Decl. ¶ 27)

Tecnimed has offered evidence that significantly undermines Kidz-Med's cost calculations.  Tecnimed notes, for example, that while Kidz-Med claims to have distributed its thermometers to Duane Reade, Fred Meyer, and Price Chopper, the product does not appear on any of these retailers' websites.  (Tirotta Supp. Decl. ¶ 27; Bellifemine Supp. Decl., Ex. 6)

Whatever the costs of a recall, however, Kidz-Med is largely to blame for those costs, because it continued to stock retailers with its thermometer long after Tecnimed brought its trademark infringement claim.  Kidz-Med's Form S-1 reports that "[t]he Company received and shipped the first 2,000 unit orders in September 2010 and received and shipped another 10,000 units in October through early November 2010."  (Bellifemine Supp. Decl., Ex. 2, at 27) Kidz-Med shipped product in September, October, and November 2010 despite (1) Tecnimed's August 18, 2010 cease-and-desist letter (Bellifemine Decl., Ex. 37); (2) Tecnimed's September 21, 2010 Complaint (Dkt. No. 1); (3) Tecnimed's October 1, 2010 application for a preliminary injunction (Dkt. No. 3); and (4) an October 29, 2010 preliminary injunction hearing, during which the Court expressed concern that "an effort was made to link these two products in the mind of the consumer," that "striking similarities" existed between the two products'

---

[5] While Kidz-Med argues that Tecnimed did not request recall relief at the October 29, 2010 hearing, the broad language of Tecnimed's October 1, 2010 Order to Show Cause encompasses the possibility of a recall.  (Dkt. No. 3)

packaging, and that Kidz-Med's assertion of ownership of the trade dress was unpersuasive. (Bellifemine Supp. Decl., Ex. 1, at 27, 25, 22-23)  In short, Kidz-Med was well aware of the risks associated with shipping 10,000 units in October and November 2010.  (Bellifemine Supp. Decl. ¶ 14).

Although a recall is an "extreme remedy," Conopco Inc. v. 3DO Co., 1999 WL 1277957, at *3 (S.D.N.Y. Dec. 7, 1999), it is nonetheless "well within the district court's broad powers as a court of equity." Perfect Fit. Indus., Inc. v. Acme Quilting Co., 646 F.2d 800, 805 (2d Cir. 1981).  In deciding whether to order a recall, a court should consider "the defendant's good faith or bad faith, the likelihood of diversion of customers from plaintiff to defendant, the extent of the burden entailed in a recall including the breadth of distribution and the shipping costs, and the probability that the plaintiff would benefit from such an order." Cherry River Music Co. v. Simitar Entm't, Inc., 38 F. Supp. 2d 310, 322 (S.D.N.Y. 1999) (citing Perfect Fit, 646 F.2d at 807).

Courts have ordered recalls where there is evidence that a defendant's infringement was intentional, including where the defendant continued infringing after receiving notice of its potentially unlawful conduct.   In Cherry River Music Co., for example, the court found that a recall was appropriate where the defendant "deliberately sailed in harm's way" by "continu[ing] manufacturing and shipping even after it received a cease and desist letter from plaintiffs." Cherry River Music Co.,  38 F. Supp. 2d at 323.  The court noted that the defendant "did not even stop when plaintiff moved for a preliminary injunction," choosing instead to "ship[] much of the unsold inventory . . . after it knew that it was proceeding without a valid license in the face of plaintiffs' objections and with a court order possibly imminent." Id. at 323;  see also Nikon, Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir. 1993) (upholding

district court's recall order where defendant proceeded with sale of cameras despite having been "warned by its counsel that the trademarks were similar and that [defendant] should add to its mark to avoid confusion"); SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 1999 WL 34981557, at *5 (S.D.N.Y. Sept. 10, 1999) (ordering recall where "rather than mitigate its damages, [defendant] chose to go ahead and continue to ship some twenty-two million [pieces of nicotine gum] even though it was aware of the lawsuit");  see also Columbus Rose, Ltd. v. New Millennium Press, 2010 U.S. Dist. LEXIS 9130, at *30 (W.D. Ky. Feb. 3, 2010) (enjoining sale of a book where "part of [defendant's expected monetary loss] is attributable to printing and other costs . . . which [defendant] acknowledges it only began to accrue after it was aware of the likelihood of litigation").[6]

       The fact that a defendant has acted in bad faith is not sufficient, standing alone, to establish that a recall order is appropriate.  "[A] district court should carefully consider the likely burden and expense of a recall before it imposes the remedy."  Perfect Fit. Indus, 646 F.2d at 807.  A recall is inappropriate where "the imposition of a recall may be unduly onerous, as where the defendant's products are widely distributed and particularly expensive to ship," or where "the probable benefit to the plaintiff from a recall may not outweigh the burden to the defendant . . . even if that burden is relatively light."  Id.  In addition, "the question whether the

---

[6] Although "proceeding in the face of a cease and desist demand is not inherently inconsistent with good faith because some such demands are not well grounded," Cherry River Music Co., 38 F. Supp. 2d at 324, in this case Kidz-Med should have recognized that Tecnimed's position was potentially meritorious.  Kidz-Med premised its defense on the argument that it, rather than Tecnimed, owns the trade dress at issue.  As discussed in Part II, supra, however, in the absence of a contrary agreement between a manufacturer and a distributor, the manufacturer is presumed to own a product's trademark.  Accordingly, Kidz-Med would have  been well advised to tread carefully.  Instead, Kidz-Med continued to ship product after receiving Tecnimed's cease-and-desist letter, after Tecnimed filed its motion for a preliminary injunction, and after a hearing on that motion in which this Court expressed serious concerns about the merits of Kidz-Med's position.

district court has held an evidentiary hearing as opposed to deciding the matter on affidavits and the likelihood that fuller development of the facts might alter its view are quite relevant." Cherry River Music Co., 38 F. Supp. 2d at 322 (citing Gund, Inc. v. Golden Bear Co., 1992 WL 392602 (1992) at *5; Hukafit Sportswear, Inc. v. Banff Ltd., 228 U.S.P.Q. 249, 251-53 (S.D.N.Y. 1985)).

Here, neither side has requested a hearing concerning this issue, and it is not clear what additional facts would emerge at a hearing. The Court will, however, give Kidz-Med the benefit of the doubt and assume that its estimate of the costs of a recall – approximately $95,000 – is accurate. (Tirotta Supp. Decl. ¶ 27) Courts have ordered much more costly recalls where, as here, a defendant has acted in bad faith. In Cherry River Music Co., the court ordered a recall costing as much as $10 million after concluding that a defendant had – as here – continued to ship infringing products "after it received a cease and desist letter from plaintiffs" and even after plaintiffs had moved for a preliminary injunction. Cherry River Music Co., 38 F. Supp. 2d at 323. The court also ordered the recall even though it found that "[the defendant's] distribution arrangements are complex," and involved "800 to 1,000 [retailer] customers in three channels." Id. at 324; see also Gund, Inc. v. Golden Bear Co., Ltd., 1992 WL 392602, at *5 (S.D.N.Y. Dec. 10, 1992) (ordering recall after finding that "[a]lthough the [infringing products] have been widely distributed, [the defendant] did not assert that they were particularly expensive to ship").

Here, a recall by Kidz-Med would involve five retailers, rather than the 800 to 1000 at issue in Cherry River Music Co., and there is no suggestion that defendant's distribution arrangements are complex. While Kidz-Med has estimated the costs of a recall at $95,000 – not an insignificant amount for a company allegedly running out of cash – "the hardship of which it

complains was significantly of its own making, and could have been avoided or limited if it had stopped shipping when [it] received plaintiff['s] first cease and desist letter." <u>Cherry River Music Co.</u>, 38 F. Supp.2d at 324.

Tecnimed will also derive benefit from a recall.  At present, the Thermofocus directly competes against Kidz-Med's product both in "brick and mortar" stores and over the internet.[7]  Given Kidz-Med's misleading promotional efforts and the high likelihood of consumer confusion, the harm resulting to Tecnimed from Kidz-Med's continued sale of its product is likely to be substantial.  Because consumers are likely to buy only one non-contact thermometer, a Kidz-Med sale obtained at Tecnimed's expense will not be recouped in the future.

Accordingly, the Court finds that the balance of hardships favors a recall of the Kidz-Med product.

---

[7] The existence of actual competition is a factor in assessing whether the potential benefit to a plaintiff is sufficient to justify a recall.  <u>See</u> <u>Primavera Labs., Inc. v. Elizabeth Arden Co.</u>, 1993 WL 319214, at *1 (S.D.N.Y. Aug. 13, 1999) (denying recall relief where the two products were not "competing for the same consumer dollar").  Here, Kidz-Med claims that Tecnimed has "failed to secure a single customer in the United States to sell its Thermofocus thermometers" (Tirotta Supp. Decl. ¶ 8), and further asserts that "the Thermofocus in Kidz-Med packaging is not available in any retail store in the United States other than possibly Buy Buy Baby."  (Tirotta Supp. Decl. ¶ 7)

Kidz-Med's claim that Tecnimed has no retail presence, however, is undermined by Kidz-Med's own statement, in its November 2010 Form S-1, that "BabiesRUS, Buy Buy Baby and CVS.com are currently selling the Thermofocus 5-in-1 purchased from us."  (Bellifemine Supp. Decl., Ex. 2, at 19)  Tecnimed has likewise offered evidence that major retailers, such as Costco and Walmart, continue to sell the Thermofocus. (Bellifemine Reply Decl. ¶ 13, Ex. 9, Ex. 10) Accordingly, the evidence demonstrates that there is some degree of active competition between the two thermometers in major retail chains.  Because Kidz-Med's highly confusing packaging creates a risk that Tecnimed will lose sales to Kidz-Med, <u>see</u> Part III, <u>supra</u>, a recall of Kidz-Med's product will afford tangible benefit to Tecnimed.

## V.        **PUBLIC INTEREST**

As the final step in the <u>Salinger</u> analysis, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." <u>Salinger</u>, 607 F.3d at 80 (quoting <u>eBay v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006)).

The public interest would not be disserved by the issuance of a preliminary injunction here. Assuming <u>arguendo</u> that the Kidz-Med product is superior to the Thermofocus, an injunction would not deprive the public of Kidz-Med's product. It would simply require Kidz-Med to package its product in a way that is not likely to cause consumer confusion between its product and the Thermofocus. This requirement serves the public interest by removing confusing trade dress from the marketplace. <u>See</u> <u>New York City Triathlon, LLC</u>, 704 F. Supp. 2d at 345 ("[T]he public has an interest in not being deceived – in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.")

                     *            *            *            *

Tecnimed has demonstrated that (1) it is likely to succeed on the merits of its trademark infringement claim; (2) it is likely to suffer irreparable injury in the absence of an injunction; (3) the balance of hardships favors the granting of an injunction; and (4) the public interest will not be disserved by the issuance of an injunction. Accordingly, the <u>Salinger</u> test is satisfied and a preliminary injunction is appropriate.

## VI.       **POSTING OF BOND**

Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In this case, Kidz-Med has submitted evidence that the costs associated with changing its packaging prospectively will be approximately $35,000, and the costs associated with a recall will be approximately $95,000. Accordingly, Tecnimed will post a bond in the amount of $130,000.

## CONCLUSION

The foregoing sets forth the Court's findings of fact and conclusions of law. Plaintiffs' motion for a preliminary injunction is GRANTED.

It is hereby ORDERED that:

(1) Defendants Kidz-Med, Inc. and American Scientific Resources, Inc., and their officers, agents, servants, employees, and attorneys and all persons in active concert or participation with any of them who receive actual notice of this order by personal service or otherwise be and they hereby are enjoined and restrained, pending the hearing and determination of this action, from marketing or selling the new Kidz-Med non-contact thermometer using words, symbols, trade dress are any combination thereof that are likely to cause confusion between the Thermofocus 5-in-1 and Kidz-Med's new non-contact thermometer, including using the current packaging for the Kidz-Med product. Within five (5) business days of the issuance of this memorandum opinion and order, the parties shall submit a proposed order specifying the changes in packaging that Kidz-Med will observe in order to eliminate this risk.

(2) It is further ORDERED that, within seven (7) business days from the date of this order, Kidz-Med shall notify in writing each customer to whom it has sold or distributed the Kidz-Med non-contact thermometer in the confusing trade dress that the thermometer has

32

been recalled pursuant to the order of this Court, requesting that the addressee immediately

cease the sale or distribution of the product and that it return all product in its possession,

custody, or control to Kidz-Med pending Kidz-Med's replacement of the packaging with non-

infringing packaging, and offering to reimburse the addressee for the reasonable costs incurred

in doing so.

Dated:      New York, New York
          January 18, 2011

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge