UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TECNIMED SRL,

                         Plaintiff,

          - v. –

KIDZ-MED, INC., and
AMERICAN SCIENTIFIC RESOURCES,
INC.,

                         Defendants.

**MEMORANDUM
OPINION & ORDER**

10 Civ. 7277 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       In a Memorandum Opinion and Order dated January 18, 2011 (Dkt. No. 38), this Court granted Tecnimed SRL's motion for a preliminary injunction (Dkt. No. 3) based on its claim that Defendant Kidz-Med's packaging for its non-contact thermometer infringed the trade dress of Tecnimed's "Thermofocus" non-contact thermometer.[1]  The Court's Order requires Kidz-Med to change its packaging to eliminate the risk of customer confusion.  (Memorandum Opinion & Order at 32)

       The Court also granted Tecnimed's application for a recall of Kidz-Med units that are packaged in the infringing trade dress.  In making this determination, the Court considered and addressed "'the defendant's good faith or bad faith, the likelihood of diversion of customers from plaintiff to defendant, the extent of the burden entailed in a recall, including the breadth of distribution and the shipping costs, and the probability that the plaintiff would benefit from such an order.'"  (Opinion & Order at 27 (quoting Cherry River Music Co. v. Simitar Entm't, Inc., 38 F. Supp. 2d 310, 322 (S.D.N.Y. 1999) (citing Perfect Fit Indus., Inc. v. Acme Quilting Co., 646 F.2d 800, 807 (2d Cir. 1981))).  As discussed in the Opinion and Order (at 25-30), all of these

---

[1]  The facts concerning the trade dress dispute between the parties are discussed at length in the Court's Memorandum Opinion and Order (Dkt. No. 38, at 1-5) and will not be repeated here.

factors support a recall.  Pursuant to Federal Rule of Civil Procedure 62(c), Kidz-Med now seeks

a stay of the recall order pending appeal.  For the reasons stated below, Kidz-Med's application

for a stay will be DENIED.

## DISCUSSION

### I.  STANDARD FOR ISSUING A STAY PENDING APPEAL

"The four factors to be considered in issuing a stay pending appeal are well

known:  '(1) whether the stay applicant has made a strong showing that he is likely to succeed on

the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether

issuance of the stay will substantially injure the other parties interested in the proceeding; and (4)

where the public interest lies.'"  In re World Trade Center Disaster Site Litig., 503 F.3d 167, 170

(2d Cir. 2007) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).  In considering these

factors, "the degree to which a factor must be present varies with the strength of the other

factors, meaning that '"more of one [factor] excuses less of the other."'"  Id. (quoting Thapa v.

Gonzales, 460 F.3d 323, 334 (2d Cir. 2006) (quoting Mohammed v. Reno, 309 F.3d 95, 101 (2d

Cir. 2002)).  "The application for a stay is not meant as a tool to reargue the merits of the

underlying case."  Silverstein v. Penguin Putnam, Inc., 2003 WL 21361734, at *1 (S.D.N.Y.

June 12, 2003).

#### A.  LIKELIHOOD OF SUCCESS ON APPEAL

A party seeking a stay pending appeal "[must demonstrate] a 'substantial

possibility' of success [on appeal]," Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002)

(quoting Dubose v. Pierce, 761 F.2d 913, 920 (2d Cir. 1985)), although "'[t]he necessary "level"

or "degree" of possibility of success will vary according to the court's assessment of the other

[stay] factors.'" <u>Mohammed</u>, 309 F.3d at 101 (quoting <u>Washington Metropolitan Area Transit</u>

<u>Commission v. Holiday Tours, Inc.</u>, 559 F.2d 841, 843 (D.C. Cir. 1977)).

   The Second Circuit will "review[] [this Court's] grant of a preliminary injunction

for abuse of discretion."  <u>Metropolitan Taxicab Bd. Of Trade v. City of New York</u>, 615 F.3d 152,

156 (2d Cir. 2010).  "'A district court abuses its discretion when it rests its decision on a clearly

erroneous finding of fact or makes an error of law.'"  <u>Id.</u> (quoting <u>Almontaser v. N.Y. City Dep't</u>

<u>of Educ.</u>, 519 F.3d 505, 508 (2d Cir. 2008)).

   **1.**  **<u>Contemporaneous Exposure</u>**

   Kidz-Med argues that it will prevail on appeal because there is no evidence that

the Thermofocus and Kidz-Med thermometers are being sold side by side, and thus there is no

proof that consumers will be confused by contemporaneous displays of Thermofocus packaging

and the packaging of Kidz-Med's competing product.  (<u>See</u> Def. Br. in Support of Stay at 6-12)

Kidz-Med argues that given (1) the absence of such evidence, and (2) the fact that "[b]oth

Tecnimed's claim and its proof of irreparable harm with respect to consumer confusion was

expressly limited to circumstances in which consumers were <u>contemporaneously</u> <u>exposed</u> to both

of the similar packages," this Court erred in granting a preliminary injunction.  (Def. Stay. Br. at

6 (emphasis in original))

   Throughout this litigation, however, Tecnimed has made clear that its claim is

based not only on contemporaneous exposure to both products, but also on the fact that –

because of Kidz-Med's infringing trade dress and misleading press releases and advertising –

consumers and retailers are likely to believe "that Defendants' new product [is] affiliated with

the Thermofocus" and that the Kidz-Med product is a successor to the Thermofocus.

(Bellifemine Decl. ¶ 48)  Tecnimed introduced evidence demonstrating that Kidz-Med has

deliberately sought to create this impression.  For example, in a press release Kidz-Med issued

shortly before it released its own product, Kidz-Med sought to benefit from favorable media

attention concerning the Thermofocus and to link that goodwill to its own product:  "We are

excited to see that the media A-list are featuring our non-contact, hygienic thermometer as a

must-have during the flu season.  Our new non-contact thermometer will be launching this year,

and we hope for similar attention to be drawn to it too."  (Bellifemine Decl., Ex. 24)[2]  Tecnimed

also submitted evidence of consumer confusion of this nature, including the following review on

Amazon.com:  "I bought the original 5and1 when we recently had a baby last year.  When they

came out with [their] new one, I had to try it.  I just got it and WOW it's even better!"

(Bellifemine Decl., Ex. 31; see also Opinion & Order at 3, 15)  In sum, while Tecnimed

introduced evidence concerning the risk of confusion arising from contemporaneous exposure

(see Bellifemine Decl., Ex. 17), neither its proof nor its irreparable harm argument was limited to

that context.

    Kidz-Med's claim that "[t]he recall order is directed solely to the potential loss of

sales to consumers, and not to Tecnimed's separate allegations of potential confusion among

professional retailer buyers" (Def. Stay Br. at 6), is likewise false.  In its January 18 Opinion and

---

[2]  As part of its campaign to link the Thermofocus to its own product, Kidz-Med also used "(1)
the testimonial of a children's hospital physician to promote its new thermometer, when the
physician was actually praising the Thermofocus; (2) FAQs and other testimonials originally
used for the Thermofocus in order to promote its own product; and (3) the metatag
'Thermofocus' on its website in order to direct prospective Tecnimed customers to Kidz-Med's
website."  (Opinion & Order at 3 (citing Bellifemine Decl., Ex. 18, 29-30))

Kidz-Med argues that its intentional efforts to sow confusion in the marketplace were improperly
considered by the Court, because these efforts "ended nearly six months ago." (Def. Stay Br. at
8, 8 n.6)  The Court is not persuaded that these admitted incidents of Kidz-Med's bad faith
marketing can be so easily brushed aside, nor has Kidz-Med demonstrated that the effects of its
misconduct have dissipated.

Order, the Court found a reasonable probability that retailers would "'consider the new product distributed by Kidz-Med to be an affiliate or second generation version of the Thermofocus'" (see Opinion & Order at 21-22 (quoting Bellifemine Supp. Decl. ¶ 10)), and concluded that "[b]ecause Kidz-Med's highly confusing packaging creates a risk that Tecnimed will lose sales to Kidz-Med . . . a recall of Kidz-Med's product will afford tangible benefit to Tecnimed." (Opinion & Order at 30 n.7)  The recall order thus addresses confusion at both the retailer and consumer levels, recognizing that Kidz-Med has improperly aligned itself with the Thermofocus in order to facilitate relationships with retail customers, as well as sales to consumers, all to Tecnimed's detriment.

Because this Court found that there is a significant risk that retailers and consumers would -- because of Kidz-Med's misconduct -- incorrectly perceive a "successor" relationship between the Thermofocus and Kidz-Med's new product, its decision does not depend on the contemporaneous placement of the Kidz-Med packaging alongside the similar blue and purple Thermofocus packaging.  Indeed, the January 18 Opinion and Order states that while "the packaging for the [Thermofocus units distributed by non-Kidz-Med distributors] does not at all resemble the packaging at issue in this lawsuit . . . [t]his is not the proper point of comparison."  (Opinion & Order at 14 n.1)  The Court's opinion emphasizes that "[t]he concern is that [the] similarities [between the two products' packaging and promotion] will lead consumers to purchase the Kidz-Med product because they incorrectly believe it is associated with the Thermofocus."  Id.[3]

---

[3]  Kidz-Med's suggestion that the concern about a misperceived "successor" relationship is fanciful (see Def. Stay Reply Br. at 5) is rebutted by Kidz-Med's own decision to use trade dress and promotional materials designed to capitalize on the Thermofocus's goodwill.

**2.    Current Thermofocus Sales**

Kidz-Med also argues that the Court did not give proper weight to its claim that "Tecnimed does not have an appreciable volume of <u>current</u> sales in the United States market" (Def. Stay Br. at 13 (emphasis in original)).  This Court acknowledged in its Opinion and Order that Kidz-Med had submitted evidence of Tecnimed's limited sales (<u>see</u> Opinion & Order at 22), but it chose to rely on countervailing evidence demonstrating that Tecnimed's product was on sale at a number of major retail outlets.  (Opinion & Order at 22 (citing Bellifemine Reply Decl. ¶ 13, Ex. 9, Ex. 10; Bellifemine Supp. Decl. ¶ 6, Ex. 2 at 19))  In opposing Kidz-Med's motion for a stay, Tecnimed has further substantiated its claim of continuing Thermofocus sales with invoices from BV Medical, dated May 10, October 14, and December 22, 2010.  (Kinney Stay Decl., Ex. F)

**3.    Kidz-Med's Bad Faith**

Finally, Kidz-Med contends that this Court erred in concluding that Kidz-Med acted in bad faith when it continued to ship its potentially infringing product through November 2010.  (Def. Stay Br. at 16)  Kidz-Med notes that  a "'defendant's refusal to abandon a mark in the face of a cease and desist letter cannot demonstrate bad faith standing alone.'"  (Def. Stay Br. at 16)  (quoting <u>O'Keefe v. Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008) (internal citations omitted)).  However, the Court's determination that Kidz-Med acted in bad faith does not rest solely on Kidz-Med's decision to continue its infringing actions after receiving Tecnimed's August 2010 cease-and-desist letter.  The Court's Opinion and Order states that:

> Kidz-Med shipped product in September, October, and November 2010 despite (1) Tecnimed's August 18, 2010 cease-and-desist letter (Bellifemine Decl., Ex. 37); (2) Tecnimed's September 21, 2010 Complaint (Dkt. No. 1); (3) Tecnimed's

October 1, 2010 application for a preliminary injunction (Dkt. No. 3); and (4) an October 29, 2010 preliminary injunction hearing, during which the Court expressed concern that "an effort was made to link these two products in the mind of the consumer," that "striking similarities" existed between the two products' packaging, and that Kidz-Med's assertion of ownership of the trade dress was unpersuasive (Bellifemine Supp. Decl., Ex. 1, at 27, 25, 22-23).

(Opinion & Order at 26-27)  As this excerpt makes clear, the Court's finding of bad faith does not rest merely on Kidz-Med's failure to change its packaging in response to Tecnimed's cease-and-desist letter.[4]

Kidz-Med has not demonstrated that this Court's issuance of a preliminary injunction rests "'on a clearly erroneous finding of fact or . . . error of law.'"  Metropolitan Taxicab Bd., 615 F.3d at 156 (quoting Almontaser, 519 F.3d at 508).  Accordingly, it has not "made a strong showing that [it] is likely to succeed on the merits [of an appeal]."  In re World Trade Center, 503 F.3d at 170.

### B.   IRREPARABLE INJURY TO KIDZ-MED

Kidz-Med argues that it is likely to suffer irreparable injury absent a stay from "the combination of the out-of-pocket costs, its financial state, the loss of all revenue from its

---

[4] Kidz-Med also asserts that it attempted to settle the matter in November 2010, but could not reach agreement with Tecnimed concerning packaging changes.  (Def. Stay Br. at 17 (citing Yeskoo Supp. Aff. ¶¶ 2-9, Ex. 1-7))  Kidz-Med argues that "[i]f Tecnimed had not insisted that Kidz-Med give up . . . generic phrases following the [October 29] hearing, Kidz-Med's packaging would have been changed last year."  (Def. Stay Br. at 18)  Tecnimed argues that its efforts to settle the packaging issue demonstrate that it was not acting in bad faith.  (Def. Stay Br. at 18-19)

Accepting Kidz-Med's argument that it made efforts to settle the case after the October 29, 2010 preliminary injunction hearing, the fact remains that it chose to continue to ship product in the infringing packaging after the October hearing.  (Opinion & Order at 27-28, 28 n.6 (citing cases))  Kidz-Med could have suspended shipments in the challenged packaging pending the Court's determination of the preliminary injunction motion.  Because it chose to continue shipping, "[w]hatever the costs of a recall . . . Kidz-Med is largely to blame for those costs[.]" (Opinion & Order at 26)

principal product, and the risk of customer loss."  (Def. Stay Br. at 19; see also O'Leary Decl. ¶¶

14-18)  Kidz-Med further claims that the $95,000 bond, which the Court ordered at Kidz-Med's

request in connection with the recall, and which has now been posted by Tecnimed, "covers only

the out-of-pocket costs."  (Def. Stay Br. at 19)

   This represents a shift in Kidz-Med's position.  In opposing Tecnimed's

preliminary injunction motion, Kidz-Med submitted a comprehensive accounting of all costs

associated with a recall, and represented to this Court that the total cost of a recall would be

$95,000.  (Tirotta Supp. Decl. ¶ 27; O'Leary Decl. ¶ 17)  The Court accepted this figure and

ordered a bond in that amount, despite Tecnimed's evidence that the true cost of a recall would

be less than $95,000.  (Opinion & Order at 26, 29)  Having obtained a bond in the amount it

claimed was necessary to secure it against loss, Kidz-Med cannot now claim that the bond it

sought is insufficient.

   As to Kidz-Med's financial condition, the Court acknowledged in the Opinion and

Order that $95,000 was "not an insignificant amount for a company allegedly running out of

cash," but found that "'the hardship of which [Kidz-Med] complains was significantly of its own

making, and could have been avoided or limited if it had stopped shipping'" after the cease-and-

desist letter or at least after the October 29 hearing.  (Opinion & Order at 29-30 (quoting Cherry

River Music Co. v. Simitar Entm't, Inc., 38 F. Supp. 2d 310, 322 (S.D.N.Y. 1999)).

   Similarly, assuming arguendo that the recall will strain Kidz-Med's relationships

with retail customers, Kidz-Med had an opportunity to mitigate this potential harm when it first

learned of Tecnimed's suit, and again after the preliminary injunction hearing.  It chose not to do

so.  Moreover, as this Court concluded in its Opinion and Order (see Opinion & Order at 12-18,

21), Kidz-Med has cultivated retail relationships through its use of potentially infringing trade

dress.  To the extent that the recall will damage Kidz-Med's relationships with retailers, Tecnimed has made a persuasive showing that – to the extent Kidz-Med formed those relationships based on infringing packaging and misleading advertising and promotional materials – those relationships were wrongfully obtained.  In short, this Court set the bond amount in accordance with Kidz-Med's request, and will not revisit that determination.

### C.    <u>SUBSTANTIAL INJURY TO TECNIMED</u>

In its Opinion and Order, this Court found that Tecnimed would derive benefit from a recall because "the Thermofocus directly compete[s] against Kidz-Med's product both in 'brick and mortar' stores and over the internet."  (Opinion & Order at 30, 30 n.7)  This conclusion was based on (1) the fact that the Thermofocus and Kidz-Med's product are direct competitors, which Kidz-Med admits in its SEC disclosure materials (Opinion & Order at 15 (citing Bellifemine Decl., Ex. 15, at 23)); (2) the Court's finding that the Thermofocus is on sale at several retailers (Opinion & Order at 22 (citing Bellifemine Reply Decl. ¶ 13, Ex. 9, Ex. 10; Bellifemine Supp. Decl. ¶ 6, Ex. 2 at 19)); and (3) the Court's finding, based on its analysis of the <u>Polaroid</u> factors, that Kidz-Med's packaging had created a high likelihood of consumer confusion between its product and the Thermofocus.  (Opinion & Order at 12-18; 30 n.7).

In the absence of a recall, "Kidz-Med's highly confusing packaging creates a risk that Tecnimed will lose sales to Kidz-Med."  (Opinion & Order at 30 n.7)  Moreover, because we are "in the midst of cough and flu season" (Pltf. Stay Br. at 15), a stay of the recall would likely permit Kidz-Med to sell out its existing inventory, effectively nullifying the recall order.  "There is, of course, a considerable reluctance in granting an injunction pending appeal when to do so, in effect, is to give the appellant the ultimate relief he is seeking."  11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 3637 (2d ed. 1995) (citing

9

cases).  Given that Kidz-Med waited ten days before filing its stay motion, there is also some

evidence that it is attempting to "run out the clock" in order to nullify the Court's recall order.

      **D.**      <u>**PUBLIC INTEREST**</u>

           In its Opinion and Order, the Court noted that injunctive relief would "serve[] the

public interest by removing confusing trade dress from the marketplace."  (Opinion & Order at

31 (citing <u>New York City Triathlon, LLC v. NYC Triathlon Club, Inc.</u>, 704 F. Supp. 2d 305, 345

(S.D.N.Y. 2010) ("[T]he public has an interest in not being deceived – in being assured that the

mark it associates with a product is not attached to goods of unknown origin and quality."))

Kidz-Med makes no argument suggesting that this Court should revisit its findings regarding the

public interest (<u>see</u> Def. Stay Br. at 6).

                *        *        *        *

           Kidz-Med has not prevailed on any of the four factors this Court must consider

under <u>In re World Trade Center</u>, 503 F.3d at 170, in ruling on an application for Rule 62(c) stay

pending appeal.  Accordingly, its motion for a stay under Rule 62(c) is DENIED.

**II.**     <u>**ADMINISTRATIVE STAY**</u>

           Alternatively, Kidz-Med "request[s] that the Court grant a temporary,

administrative stay of the injunction to give the Court of Appeals sufficient time to rule on a

motion for stay pending appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2)."  (Def.

Stay Br. at 20)  Kidz-Med has not cited any authority suggesting that a temporary stay is

appropriate where a Rule 62(c) stay motion has been denied.  Accordingly, that application is

likewise DENIED.  <u>See</u> <u>Leinster Inter S.A. v. Botley Ltd.</u>, 2009 WL 5246211, at *1 (S.D.N.Y.

Dec. 30, 2009) (denying motion for temporary stay "pending determination . . . of plaintiff's

currently pending motion for a stay pursuant to Federal Rule of Appellate Procedure 8(a)(2)" and reasoning that "plaintiff is free to seek such relief from the Court of Appeals").

Dated:  New York, New York
        February 9, 2011                     SO ORDERED.

                                        _____
                                        Paul G. Gardephe
                                        United States District Judge